**In re FEDERAL FACILITIES REALTY TRUST.**

**DARROW, v. MOSSER.**

**GUILD v. DARROW.**

Nos. 9935, 9936.

United States Court of Appeals
Seventh Circuit.

Aug. 14, 1950.

Rehearing Denied Sept. 21, 1950.

Irving Herriott, and Urban A. Lavery, Chicago, Ill., for Paul E. Darrow.

C. W. Mulfinger, J. Edgar Kelly, Chicago, Ill., for Stacy C. Mosser.

Thomas B. Hart, J. Kirk Windle, John I. Mayer, all of Chicago, Ill., for Securities and Exchange Commission.

Jacob B. Courshon, Chicago, Ill., for John W. Guild.

Before KERNER, DUFFY and FINNEGAN, Circuit Judges.

FINNEGAN, Circuit Judge.

Two appeals in separate reorganization proceedings under Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207, are involved in case 9935. They were ordered consolidated by the District Court. The first appeal is by Paul E. Darrow, former trustee of the Federal Facilities Realty Trust, a common law trust. The second is by the same Paul E. Darrow, former trustee of the National Realty Trust, also a common law trust. In these appeals Darrow seeks to reverse an order of the District Court, entered on April 12, 1949, which surcharged him as former trustee with the sum of $43,447.46, and also to reverse all parts of such order which find that he was guilty of wrong doing or negligence as trustee in said proceedings.

Case 9936 is a cross appeal by John W. Guild, successor trustee under a trust indenture of mortgage issued by Federal Facilities Realty Trust on October 1, 1929. The cross appeal seeks to have this court declare a resulting trust in certain securities and assets of both Federal Facilities Realty Trust and of the National Realty Trust.

It appears from the record that on October 15, 1943, Paul E. Darrow, as former trustee of the Federal Facilities Realty Trust, filed his final report and account, and that thereafter and on February 11, 1944, he filed, pursuant to the order of the District Court, detailed schedules supplementing his final report and account. It likewise appears that on October 15th, 1943, said Paul E. Darrow, as former trustee of the National Realty Trust, filed his final report and account, and on April 21, 1944 again pursuant to an order of the District Court, filed detailed schedules supplementing such final report and account.

On May 15th, 1944, the Securities and Exchange Commission filed objections to each of said final reports and accounts as supplemented. Objections were also filed by Stacy C. Mosser, as successor trustee in both reorganization proceedings. In the Federal Facilities Realty Trust proceedings, objections were also filed by John W. Guild, successor trustee, under a mortgage indenture of said Federal Facilities Realty Trust, dated October 1, 1929.

The various objectors to the trustee's reports and accounts of October 15, 1943, claim among other things, that discrepancies existed in his accounts; that there was a failure to show correct accrued interest and earnings on holdings of certain subsidiaries; that loans of trust funds were made and not accounted for; that items in operating expense were not properly explained; that profits made in trading with Jacob Kulp and Myrtle Johnson in bonds of subsidiaries were not stated; that the trustee failed to explain his actions in failing to prosecute certain causes of action; that the trustee's requested compensation should not be allowed; that he failed to state profits he made in connection with the purchase, through one Goldman, of certain securities; that there was a failure to disclose commissions or discounts paid to the trustee on account of certain insurance purchases; and that there was failure to disclose fully business transactions and profits made with Colonial Securities Company.

The District Court referred the accounts and reports, together with the objections thereto, to a Special Master, directing him to conduct full and complete hearings and to report to the court his findings of fact and his conclusions of law thereon.

The hearings began on October 25, 1944 and concluded on May 28, 1947. More than 2500 pages of testimony were taken. Counsel for the various parties conducted extended examination upon all matters contained in the reports and accounts of Darrow, as former trustee, and filed written briefs with the Special Master.

On April 29, 1948, the report of the Special Master was filed.

It is pertinent to note here that Darrow's special report in Federal Facilities Realty Trust covers his entire trusteeship from April 25, 1935 to August 13, 1943. In the National Realty Trust proceeding Darrow filed a report on November 30, 1940 which was approved on January 31, 1941. In this proceeding therefore the report and account here involved covered the period from December 1, 1940 to August 13, 1943. The finding of the Master was: "During the eight and one-third years of Darrow's trusteeship he filed no reports of his administration of Federal and only one of his administration of National."

On April 12, 1949, the trial court overruled Darrow's objections to the report of the Special Master, and surcharged him as former trustee with the sum of $43,447.-46 because of profits made by two of his employees in dealing in underlying securities, consisting of bonds of subsidiaries of the Debtor Trusts.

The order of April 12, 1949 further provides: "The determination of the ownership of certain securities described (in the Master's report) as 'securities in Lot 2'; whether or not Paul E. Darrow should be further surcharged for profits made in dealing in the securities involved in Seligman v. Kulp; whether or not Paul E. Darrow should be surcharged for conduct in connection with the purchase of certain assets of Kulp & Company by his employee, Myrtle Johnson; and whether or not Paul E. Darrow should be paid additional compensation requested in his final reports and accounts will undoubtedly throw further light on the question whether Paul E. Darrow should be allowed the requested compensation, and therefore the foregoing matters are referred to a Special Master, in accordance with the general order of reference entered herein June 10, 1948."

Said order of April 12, 1949, also reserves the right to make further orders.

There is little, if any, controversy as to the facts pertinent to the problems presented in these appeals.

For many years prior to 1929, one Jacob Kulp had been engaged in constructing buildings in various localities throughout the country. He had erected twenty-seven such buildings, the majority of which had been leased to the Government of the United States for post office purposes. He had caused corporations to be organized to take title to all these properties save one, which was later incorporated. Individually and through a corporation, Kulp and Company, which he appears to have controlled, he had marketed securities of these various corporations and also those of the one unincorporated property. From the beginning Myrtle Johnson was associated with Mr. Kulp in these activities.

In 1929 and 1930 Jacob Kulp and Miss Johnson caused two common law trusts, Federal Facilities Realty Trust and National Realty Trust to be created. Thereupon Kulp transferred to Federal all of the capital stock of fourteen of these building corporations, and to National he transferred the stock of twelve such building corporations together with the title to the one (then unincorporated) piece of property. These building corporations and the unincorporated piece of property had various outstanding bond issues. They and their securities are referred to throughout the record as "subsidiaries."

When the common law trusts were organized certificates of beneficial ownership were issued. Most of these went to Jacob Kulp in exchange for the stock of the building corporations and for title to the unincorporated property. Federal Facilities Realty Trust also issued bonds in the principal amount of $550,000, of which Kulp received $300,000 in principal amount as additional consideration for the transfer of stock in the fourteen building corporations turned over to that trust.

The securities of the subsidiaries had been marketed by Jacob Kulp through Kulp and Company, as well as by other organizations dealing in such securities. Kulp and Company also managed the various subsidiaries, and their properties and also other property not involved in these proceedings.

In 1931, Kulp and Miss Johnson organized the Colonial Securities Company, which engaged in general securities business in Chicago, and dealt in the securities of the subsidiary corporations.

Some time before 1933, the Post Office Department of the United States changed its policy of renting post offices and inaugurated a policy of erecting its own buildings. This made it difficult, if not impossible, to refinance the subsidiaries of the Federal Facilities and National Trusts because it was found that the Post Office Department would not renew existing leases. An investigation was made by the Department of Justice of the Federal and National Common Law Trusts and their subsidiaries. As a result Kulp, in July 1933, transferred all of the Certificates of Beneficial Ownership of Federal and National, together with his Collateral Trust Bonds issued by Federal to a Trustee, George H. Andresen, under a trust agreement referred to in the record as the Andresen Trust. Thereafter Andresen through Federal and National took over the management of the twenty-seven subsidiaries and continued such management for nearly two years, or until the appointment of Darrow as trustee. During all of Andresen's administration of Federal and National Trusts and their subsidiaries, he employed Jacob Kulp and Miss Johnson on a part-time basis, with the agreement that they would be allowed to operate the business of their Colonial Securities Company.

The present proceedings were instituted on December 26, 1934, by petition under Section 77B of the Bankruptcy Act, filed in the District Court for the Northern District of Illinois, which on April 25, 1935, entered an order approving the petitions as properly filed under said section of the Bankruptcy Act.

Paul E. Darrow was appointed trustee of Federal Facilities on April 25, 1935, and on May 24, 1935, he was appointed trustee of National Realty. He continued to act as trustee in both estates until his resignation August 13, 1943.

The orders appointing Darrow provided that he be directed and authorized to oper-

ate, maintain, and continue the business of the debtors and to manage their property until the further order of the court; that he should have and exercise, consistently with the provisions of Section 77B, all the powers of the trustee appointed pursuant to said section, subject at all times to the control and order of the court, and to such limitations and conditions as the court might from time to time impose and prescribe; that he should have full power and authority to do all things necessary or convenient to operation of the business and maintenance and preservation of said estates; that he be vested with all the rights, powers, and authority of a trustee in bankruptcy and of a receiver in equity.

After the appointment and qualification of Darrow, the former trustee, George Andresen, recommended to him that he employ Jacob Kulp and Myrtle Johnson to assist him. It was pointed out that they were well qualified to assist because of their intimate knowledge of the workings of the trusts and their subsidiaries. However, Miss Johnson and Kulp made it clear that they would remain as part-time employees only on condition that they be allowed to continue to operate in the securities business through Colonial Securities Company. Darrow employed them on a part-time basis, and they continued to operate Colonial, in the same way that had been practised during their employment by the Andresen trust.

As we have pointed out, the record herein is so voluminous that it would be impracticable to detail in full the conduct of these trusts by Darrow and his employees, Johnson and Kulp. Consequently, we will consider only those matters which have a direct bearing upon the questions presented by these appeals.

First, we consider Darrow's dealings in the purchase of securities.

It was Darrow's policy, as trustee, to acquire by purchase outstanding defaulted bonds of the various subsidiaries. During the eight years of his trusteeship he persevered in that policy and bought from individual bondholders and from dealers in securities, including Colonial operated by

Miss Johnson and Jacob Kulp, subsidiary bonds of the total par value of $2,414,600. Due in large part to these purchases, the obligation of the subsidiaries (which were principally outstanding bonds) were reduced, during his eight years of trusteeship, from $7,611,700 par value to $5,197,100 par value.

These securities were purchased by Darrow partly for the debtor trusts, but the far greater part were acquired for the subsidiaries. At the time of his resignation, he held as trustee for Federal and National $437,800, in principal amount, of bonds which Darrow had acquired at a total cost of $79,333.80. These bonds, on his resignation, had a market value of $164,279, and in addition the debtor trusts, Federal and National had received on the bonds purchased for them the sum of $45,907.15 in interest. Therefore, the appreciation in market value of the subsidiary bonds, plus the interest received thereon, establish as a benefit to the debtor trusts from the transactions in the bonds, which amounts approximately to the sum of $130,700. The Special Master in his report gives a breakdown of these figures.

He finds that, in the instance of Federal Facilities Trust, the total cost of all its subsidiary securities purchased by Darrow, was $31,864.55. Each of these bonds was brought by him at the prevailing market price. At the time of his resignation the bonds had a market price of more than $38,000. The testimony was that at the time of hearing before the Special Master the market price of these securities was more than $87,100. It is further reported that up to that time the debtor trust, Federal Facilities, had received $24,494 in interest on these securities.

In the case of National Realty Trust, the total cost of subsidiary securities purchased by Darrow was $47,469.25. Again each of these was purchased at the market price. At the date of Darrow's resignation these bonds had a market value of $56,635, and the testimony was that the market value, at the time of the hearings before the Master, was $77,179. It was further then reported that up to that time the debtor trust National had received $21,412.81 in interest on these securities.

As a matter of fact, the Special Master reports: "As of the date of Darrow's resignation there had been a loss on only one group of bonds purchased. The loss on certain Quincy Station Post Office Building Corporation Second Mortgage bonds (a subsidiary of Federal Facilities) amounted to $200. Interest on these collected up to that time, however, amounted to $1,966.25. On September 25, 1946, Miss Johnson stated that the value of these bonds had risen substantially since Darrow's resignation."

It is pertinent to note here that at the time of the filing of Darrow's final reports, practically all of the subsidiary corporations had been re-organized.

During his administration Darrow had likewise acquired from the First National Bank of Chicago for the Sum of $12,000 Collateral Trust bonds issued by Federal Facilities, amounting in par value to $84,000. If on reorganization these bonds are found to be worth par, and this expectation seems to be reasonable, there would be a substantial benefit to the Federal Facilities estate. In the meantime, of course, that debtor trust is relieved from the payment of interest on these bonds.

The Special Master found in his report: "There is not a scintilla of evidence to prove that Mr. Darrow profited in any sum whatsoever through his trading in securities of the trusts and the subsidiaries, but it is clear that Mr. Darrow failed to exercise due care and prudence in the administration of the trust estates."

II. Now we proceed to an examination of the so-called Seligman transaction.

Prior to the appointment of Darrow as trustee, suit had been instituted in the Superior Court of Cook County, Illinois, by one Seligman against Jacob Kulp. The suit sought the appointment of a receiver to take possession of certain securities which Kulp had turned over to the trustee in the Andresen trust.

A receiver was appointed and there were turned over to him 62,358 units of beneficial ownership in Federal Facilities and 10,761.6 units of beneficial ownership in National, together with Collateral Trust Bonds of Federal in the principal sum of $286,100. There were also delivered to the State Court Receiver $199,000 in par value of bonds of subsidiaries of Federal and National.

On May 6, 1938, these securities were sold at public sales by order of the Superior Court of Cook County, Illinois. The Special Master reports: "That long before the sale was decreed he (Darrow) evidently felt that the purchase of those securities by him would be beneficial to the trusts, and instructed his attorney to seek permission of the Court (the United States District Court) to bid for the securities. Such permission was denied him for reasons which were never brought out in the testimony."

The securities to be offered for sale under the State Court's decree were divided into two lots, known as Lot 1 and Lot 2. Lot 1 embraced the bonds of the subsidiaries and Lot 2 the units of beneficial ownership in the debtor trusts, and the Collateral Trust bonds of Federal Facilities.

Prior to the sales, Miss Johnson and Kulp, acting through Colonial, determined to make a bid for these securities up to $25,000. They arranged for loans to carry out their intention. They procured a lawyer, Goodman, since deceased, who was attorney for the petitioning creditors herein, to act on their behalf in effecting the purchase. Their bid was successful and they purchased the securities involved for a total cost, including commissions, of $24,203.55.

On about May 16, 1938, Darrow agreed to purchase some of the subsidiary bonds in Lot 1 for $12,447.55. He issued checks of the subsidiary corporations involved for that amount on May 18, 1938. The sale under decree had been reported and confirmed but payment had not been made at the time of this purchase by Darrow.

On May 19, 1938, payment was made and the securities delivered. It is undisputed that the checks issued by Darrow to Colonial were used in making the payment due under the bid. The prices paid by Darrow for these securities were substantially the market price at that time,—"the prices at which the securities were selling or that we had paid for the securities."

The record shows that at the time of the hearings before the Master these securities had a market value of $31,195.

Securities in Lot 1 of the par value of $10,000 were given to the persons who had loaned or agreed to loan Miss Johnson the funds necessary to effectuate the purchase —a gentleman named Levy and another named Peterson who is related to Miss Johnson. The balance of the subsidiary securities were sold to the general public for $19,457.50.

The securities in Lot 2 were not disposed of, they were at the time of the hearing before the Master, and still are under the control of the District Court. There is no testimony as to their value. These are among the securities involved in the cross appeal.

The Special Master surcharged Darrow for alleged profits of his employees in the Seligman transaction with the sum of $10,701.50, and recommended that a further surcharge should be made in the future if any profits are realized from the sale of Securities in Seligman Lot 2.

III. The items of surcharges recommended by the Special Master and confirmed by the District Court, are shown in the following table:

A

Sales by Employees
Direct to Darrow
   Profits on sales
     for account of
     Federal ......$ 4,051.60
   Profits on sales
     for account of
     National ..... 4,572.50

Total profits on these sales to
  Darrow ................. $ 8,624.10

B
Sales by Employees
to General Public
Profits on sales
of Federal se-
curities to gen-
eral public ...$10,044.36
Profits on sales
of National se-
curities to gen-
eral public ...$14,077.50

Total profits on sales to public $24,121.86

C
Surcharge against Darrow for
alleged profits to employees
in Seligman transaction..... $10,701.50

Grand total surcharges against
Darrow ................. $43,447.46

The Darrow appeals present the question as to whether or not the surcharges were properly imposed against him under the facts and circumstances disclosed in this record.

In Remington on Bankruptcy, Section 2965, it is said:

"The Receiver is bound to exercise due diligence in the selection of employees and in informing himself as to whether the business is being conducted at a profit or a loss.

"A receiver will not be surcharged * * * where he has exercised due diligence in the selection of a bookkeeper and superintendent even though in fact those employees were incompetent or dishonest."

In his work on Trusts, Scott Reporter on that subject for the American Law Institute says, in volume 2 on page 1190,

"Sec. 225—A Trustee who employs an agent in the administration * * * is not liable to the beneficiaries for losses resulting from the improper conduct of the agent unless the Trustee himself is guilty of a breach of trust."

"Accordingly if in the administration of the trust the Trustee properly employs an agent who negligently loses trust property entrusted to him or misappropriates such property or otherwise causes a loss to the trust estate the Trustee is not liable to the beneficiaries for the loss."

Perry on Trusts, says in volume 3 on page 683 (7th edition.) "Sec. 409 * * *. A Trustee who has used reasonable care in the selection of his agents for the performance of ministerial duties and who has been reasonably prudent in his supervision of the acts of the agents is not required to make good to the trust estate a loss or damage caused by the negligence or dishonesty of the agent, provided the duties delegated were such as the Trustee could properly delegate. The standard of reasonable conduct in such cases is the care which an ordinarily prudent man would exercise in the management of his own property."

In the case at bar, the Special Master whose findings and conclusions are concurred in by the District Court has reported that in view of the information available to Darrow at the time he hired Johnson and Kulp, it cannot be said that he was derelict in this respect. If after such employment Darrow was obliged to exercise "the care of an ordinarily prudent man in the management of his own property," it is difficult to see why he should be surcharged under the facts disclosed in this case. His supervision of the trust estate would disclose that the debtor trusts were being largely benefitted by the fact that he was enabled to purchase from such part time employees at market prices, the securities of their subsidiaries.

Again, the finding of the Special Master must be borne in mind.

"There is no evidence that Darrow participated in any explicit scheme or plan to defraud the trusts. * * *"

In the brief filed on behalf of Darrow, it is claimed that the appellees did not in the court below, and could not in this court, present a single bankruptcy case which sustains the theory of the trial court in assessing the surcharges against him. Appellant, on the other hand, cited and discussed a number of such cases, going as far back as an English bankruptcy case in 1794, Ex parte Belchier, 1 Amb. 218; 27 Eng. Reprint 144.

In that case there was a question of the liability of an assignee in bankruptcy who had employed a broker to sell certain tobacco belonging to the estate. The broker sold the property, and received the money therefor, but failed to turn it over to the assignee. Later the broker died insolvent. The trial court held the assignee liable. Lord Hardwick, then Lord Chancellor of England, reversed the holding and said: "If an assignee is liable in this case no man in his senses would act as assignee under the Commissioners in Bankruptcy. This court has laid down a rule with regard to the transaction of assignees and more so of trustees so as not to strike terror into mankind acting for the benefit of others and not for their own."

The case was followed in Speight v. Gaunt (1883), 22 Ch. 727, which also reversed an order of the trial court surcharging a trustee. In the Gaunt case a testamentary trustee had available for investment a large sum of money. The testator in his lifetime had done business with a certain firm of stock brokers. The trustee knew of this and consulted the same firm in and about the trust business. One of the partners in the brokerage firm duped the trustee and got physical control of the estate's funds without investing any of it. He later absconded so that the entire sum was lost. The Chancery Court reversed the trial court, and the order was sustained by the House of Lords. The Lord Chancellor said: "In the early case of ex parte Belchier (1 Amb. 218) before Lord Hardwick, it was determined that * * * when according to the usual and regular course of business, * * * and without any misconduct or default on the part of the Trustee, a loss takes place, through any fraud or neglect of the agents employed, the Trustees are not liable to make good such loss. That authority has ever since been followed."

Coming to cases in our own country, appellant cites Evans v. Williams, 6 Cir., 276 F. 650, 652. In that case the Hitt Lumber & Box Company was the bankrupt and creditors insisted that Evans, the Trustee, should be subjected to a surcharge by the court "for losses incurred in the operation of the business." The matter was referred by the court to a Referee, who held a hearing, as a result of which he recommended a surcharge against Evans for the sum of $11,759.51 * * *. The District Court confirmed the surcharge against Evans, who thereupon appealed. The Court of Appeals reversed the surcharge against the Trustee and announced the law as set forth below. The Appeals Court said, 276 F. on page 657:

"The receiver could not, and of course was not expected to, manage a business of this magnitude without expert assistants. He did employ a competent and experienced man as general manager and another competent and experienced man as bookkeeper. Had he failed to do this, he would have been guilty of gross negligence. While it is suggested that these men purposely falsified the accounts and delivered to him false inventories, nevertheless it is not contended that the receiver had any reason to believe that these inventories and accounts were not correct, * * *

"Taking all these facts into consideration * * *, this court has reached the conclusion that his failure (to discover the falsity of the employee's report) was not such negligence on his part as would entitle the trustee or the creditors to recover from him personally the losses sustained * * * therefore the judgment of the District Court is reversed."

In the Marcus case, (In re Marcus), D. C., 2 F.Supp. 524, 525, a Bankruptcy Receiver appointed by the Federal Court was operating a chain of grocery stores in the City of Pittsburgh. In that case, the business side of the Bankruptcy Proceedings was complicated. Accordingly, the Receiver, without any specific court authority whatever, proceeded to retain and employ as part time employees two of the Marcus brothers themselves, the individuals for whose questionable dealings the stores had been brought to bankruptcy. During the period that the Receiver employed the two Marcus brothers, they had secretly stolen $31,000 worth of merchandise from the various store buildings, and had also stolen $53,000 in cash while helping to operate the business. On that set of facts the Referee in Bankruptcy had surcharged the Receiver for both of those items a total of $84,000.

Judge Schoonmaker reversed the decision of the Referee and held that the Receiver should not be surcharged in any respect whatever. In so doing the Court announced the doctrine that there must be some "personal fault" on the part of a Trustee in such a situation to render him liable to be surcharged for the wrongdoing of his employees. In so holding Judge Schoonmaker said:

"We take it to be elementary law that a receiver will not be personally liable for losses sustained in the administration of an estate where he exercises good faith and ordinary care and prudence; nor will he be held for losses resulting by reason of the negligence of his employees without personal fault on his part in matters necessarily or properly committed to them in the management of the trust property. * * *

"The Pennsylvania courts I believe lay, down the correct rule, i. e., that a receiver is liable to surcharge only when guilty of fraud or supine negligence equivalent to fraud."

Judge Schoonmaker's language about "personal fault" and "supine negligence" comes directly from the opinion of the Supreme Court of the United States in the early case of Taylor v. Benham, 5 How. 233, 12 L.Ed. 130.

The Marcus case was affirmed, Revere Sugar Refinery v. Pennsylvania Trust Co., 3 Cir., 67 F.2d 1008, and the Supreme Court denied *certiorari* in 291 U.S. 679, 54 S.Ct. 528, 78 L.Ed. 1067.

In Re Portex Oil Co., D.C., 43 F.Supp. 859, and In re Breger Kosher Sausage Co., 129 F.2d 62, decided by this court, are likewise cited on behalf of Darrow as appellant.

In the Breger Kosher Sausage Company case, a bankruptcy proceeding in the District Court of Illinois, the Empire Packing Company, a creditor, had filed objections to the Trustee's account, asking that the Trustee be surcharged for two items: First, for losses incurred in the operation of the sausage business by the Trustee; and second, because the Trustee had allowed one of his employees to conduct a side-line business at the same time he was acting for the Trustee, at a substantial "profit" to himself. In the Sausage Company case the court directed the Referee in Bankruptcy to make an investigation of the facts and report back, which the Referee did, finally concluding that there should be no surcharge against the Trustee.

It appeared that "very large losses" had been incurred by the Trustee in the operation of the business after his appointment as Trustee; "that the Trustee's methods of bookkeeping were not of the best"; that the employee "had no previous experience in such business"; that the employee "during his employment" had engaged in a side-line business and had "opened up a retail outlet with money borrowed" from the Trustee himself; and finally, that "after the sale of the bankrupt estate, the employee and two principal stockholders of the bankrupt concern, went into the sausage business with money largely borrowed from the Trustee, without security."

Certainly if Darrow's employees conducted themselves in such fashion as to justify the Court surcharging Darrow for the "profits" which they made in their part time business, then such a surcharge should have been made in the Sausage Company case. However, the Referee held that "the evidence was insufficient to surcharge the Trustee for any wrongdoing while acting as Trustee in Bankruptcy." The District Court (Judge Woodward) confirmed the Referee's Report, whereupon the Objecting Creditors appealed to this Court, where the judgment of the District Court was affirmed. The opinion of this Court is of such significance that we quote the following passage from it: "The general rule is that receivers are not chargeable with losses resulting from their operation of the business, although it is their duty to exercise, diligence in selecting competent employees and informing themselves as to the profits and losses from such operation. See Remington on Bankruptcy, (4th Ed.,) §§ 446, 2662 and 2965. The degree of diligence exercised, we think, is a matter for the bankruptcy court to determine." (from the facts of each case.)

The appellees have not met the challenge of the appellants. The brief filed

on behalf of the Securities and Exchange Commission cites no case which supports, or even tends to support, the surcharges made against Darrow in the case at bar. They quote at length only a single case, American United Mutual Life Ins. Co. v. City of Avon Park, 311 U.S. 138-146, 61 S.Ct. 157, 85 L.Ed. 91, 136 A.L.R. 860. In that case a Florida city was seeking a composition of its debts under the Bankruptcy Act. In the language quoted therefrom, the Supreme Court was criticizing the "fiscal agent" of the city who had solicited claims against the city from the public and had purchased them at a discount for its own private benefit. The situation is in no way comparable to the case at bar.

The brief filed on behalf of the successor trustee, Mosser, likewise fails to cite a single relevant case. The first point urged in that brief is that a trustee may not deal with his trust in such a way as to make a personal profit for himself, and that consequently he should be surcharged for allowing his agents and employees to make profits which he could not himself make in equity. No authority is cited to sustain the last clause of the statement.

In the Mosser brief Magruder v. Drury, 235 U.S. 106, 35 S.Ct. 77, 59 L.Ed. 151, is discussed. In that case a testamentary trustee had purchased for his trust estate some real estate securities. The securities were bought through a brokerage firm of which the trustee himself was a member, and this firm had received profits by way of commissions for the purchases. Clearly the trustee was responsible to the estate for the profits so made—and the Court so held.

The brief filed on behalf of the Indenture Trustee Guild merely adopts the arguments and citations of the other appellees on this phase of the case.

We are convinced that the District Court was in error in surcharging Darrow with the items enumerated, under the facts and circumstances shown in the record. That portion of the order making the surcharge is reversed.

We cannot, however, agree with appellant's contention that Darrow was guilty of no negligence as trustee; we agree with the District Court that Darrow's failure to file reports showed a woeful neglect of duty.

The theory of the cross appeal is that part of the securities purchased by Miss Johnson in the Seligman case, referred to as Lot 2, should be impressed with a resulting trust in favor of the successor trustee of the debtor trusts. A similar contention is made with reference to certain accounts receivable which were acquired by Miss Johnson in a sale conducted by the Trustee in Bankruptcy of Jacob Kulp & Company. These matters are being urged only by the Indenture Trustee, under a deed of trust by Federal Facilities. Neither the Securities and Exchange Commission, nor Stacy C. Mosser, successor-trustee of the debtor trusts, join in the contentions or arguments presented in support thereof. The principal argument adduced on behalf of the cross-appeal is that Darrow as trustee advanced the money used to make the purchases at these judicial sales. The evidence is that other persons, Levy and Peterson agreed to loan, and actually did loan Miss Johnson, certain sums to be used in making such purchases. Both these contributors, as well as Miss Johnson, would be indispensable parties to a bill to declare a resulting trust. They are not parties to nor represented in the proceeding now before the court. This is merely a hearing on the final accounts and reports of Darrow as trustee for the debtor trusts.

Moreover, the District Court in its order of April 12, 1949, reserved for future decision "the determination of the ownership of certain securities as securities in Lot 2," as well as "whether or not Darrow should be surcharged for conduct in connection with the purchase of certain assets of Kulp & Company by his employee, Miss Johnson." These matters (with others) were referred to a special master, and the court reserved the right to make further orders in connection therewith.

In addition we are given to understand, by a motion asking leave to present oral argument herein, that these very matters are now being heard and litigated under the orders of the trial court. Consequent-

ly, on this record in appeal 9936 we are not now passing upon the question of a resulting trust, nor any of the other questions that are covered in Judge Campbell's order with reference to the Seligman transaction, nor other matters reserved by the District Court for further consideration.

The order of the District Court of April 12, 1949, so far as it surcharges Darrow with the items detailed is reversed; in all other respects said order is affirmed.

None of the parties shall recover costs on these appeals.