## MOSSER, SUCCESSOR TRUSTEE, et al. *v.* DARROW, FORMER TRUSTEE, et al.

No. 461.   Argued April 10–11, 1951.—Decided May 7, 1951.

Stanley A. Kaplan argued the cause for petitioners. With him on the brief were Carl W. Mulfinger, J. Edgar Kelly and Jacob B. Courshon.

Roger S. Foster argued the cause for the Securities & Exchange Commission, urging reversal. With him on the brief were Solicitor General Perlman, John F. Davis and David Ferber.

Urban A. Lavery and Irving Herriott argued the cause and filed a brief for Darrow, respondent.

MR. JUSTICE JACKSON delivered the opinion of the Court.

The principal question here concerns personal liability of a reorganization trustee who, although making no personal profit, permitted key employees to profit from trading in securities of the debtors' subsidiaries. Upon a long record, controlling facts have been found with little disagreement.

In 1935, the United States District Court appointed respondent Darrow as reorganization trustee for two common-law trusts. These had functioned as holding companies and their principal assets were the securities of twenty-seven underlying companies, each of which owned improved real estate and had its own debt and capital structure. Both the subsidiary companies and

the two trusts had been promoted by Jacob Kulp and Myrtle Johnson, who thoroughly knew the inside of the business and were acquainted with many of the investors. The tangled financial history leading to the reorganization is not important to our issue.

Darrow employed Kulp and Miss Johnson to assist in his trusteeship. That they were competent and useful is undenied. Kulp managed the physical properties while Miss Johnson supervised the office, had complete charge of all records of income, expenditures and properties of both debtors and all underlying companies. Darrow decided upon a policy of buying in bonds of the subsidiaries for retirement, where they were available at a discount, and during his trusteeship reduced the outstanding bonds of subsidiaries by this method by about two and one-half million dollars. Darrow depended upon Miss Johnson's judgment and advice in allocating funds for sinking fund operations, in his purchase of securities and in fixing prices to be offered.

Kulp and Miss Johnson were employed by Darrow with the express agreement that they could continue to trade in securities of the debtors' subsidiaries personally and through Colonial Securities Corporation, which they owned. Without such consent they stated they would not have remained. Darrow and Colonial for a considerable period shared office facilities and personnel, with Miss Johnson in charge both of the trustee's office, which was interested in the purchase of bonds, and her own Colonial, interested in the same thing.

Miss Johnson and Kulp, during their employment by the trustee, traded extensively in bonds of the subsidiary companies. On many occasions they acquired bonds for themselves and on the same day, or within a few days, transferred them to Darrow at a profit. Darrow paid for some securities in advance of their delivery to him and for some even before Miss Johnson had made her

own purchase of them. Johnson and Kulp sometimes bought for themselves bonds offered by bondholders who had come to the trustee's office to dispose of them to the trustee. They made substantial profits through these transactions.

In his eight years of trusteeship, Darrow filed but one account for one of the debtor-corporations and none for the other. The Securities and Exchange Commission intervened and demanded investigation of his conduct of the trust and thereafter he resigned and filed his accounts, which were met with objections by his successor trustee. These issues were referred to a special master, who heard a long contest over the foregoing and many other items unimportant here. The master recommended a surcharge on account of the foregoing conduct. The master's report was reviewed by the District Court, which concluded that the evidence supported the findings and recommendations and surcharged the trustee in the amount of $43,447.46, reserving some questions for later consideration. Darrow appealed and the Court of Appeals reversed the decision of the District Court, for reasons that we will later consider. 184 F. 2d 1. We conclude that the District Court was correct and the decision of the Court of Appeals cannot stand.

At the outset we are met with a jurisdictional objection. Respondent contends that we are powerless to grant a motion to substitute parties because the petition for the writ of certiorari is jurisdictionally defective in that it is filed in the name of Stacy Mosser, a resigned trustee. It is further contended that John W. Guild, the other named petitioner, is without standing to seek review because he is only an indenture trustee. Both contentions are erroneous.

An indenture trustee's standing is expressly authorized by 52 Stat. 894, 11 U. S. C. § 606, which provides, "the debtor, *the indenture trustees,* and any creditor or stock-

holder of the debtor shall have the right to be heard on all matters arising in a proceeding under this chapter." (Italics added.) And respondent, in opposing the motion to substitute, erroneously relies on cases involving government officers. *Davis* v. *Preston,* 280 U. S. 406; *Snyder* v. *Buck,* 340 U. S. 15. Successor trustees, unlike successors of public officers, are regarded as transferees or assignees of all the interests of their predecessor, and removal of a trustee does not cause abatement. 52 Stat. 840, 860, 11 U. S. C. § 74. We hold, in accord with *Bowden* v. *Johnson,* 107 U. S. 251, 264, that substitution is fully authorized and proper in these circumstances and accordingly turn to the merits.

This was a strict trusteeship, not one of those quasi-trusteeships in which self-interest and representative interests are combined. A reorganization trustee is the representative of the court and it is not contended and would not be arguable that if he had engaged for his own advantage in the same transactions that he authorized on the part of his subordinates he should not be surcharged. Equity tolerates in bankruptcy trustees no interest adverse to the trust. This is not because such interests are always corrupt but because they are always corrupting. By its exclusion of the trustee from any personal interest, it seeks to avoid such delicate inquiries as we have here into the conduct of its own appointees by exacting from them forbearance of all opportunities to advance self-interest that might bring the disinterestedness of their administration into question.

These strict prohibitions would serve little purpose if the trustee were free to authorize others to do what he is forbidden. While there is no charge of it here, it is obvious that this would open up opportunities for devious dealings in the name of others that the trustee could not conduct in his own. The motives of man are too complex for equity to separate in the case of its trustees the motive

of acquiring efficient help from motives of favoring help, for any reason at all or from anticipation of counter-favors later to come. We think that which the trustee had no right to do he had no right to authorize, and that the transactions were as forbidden for benefit of others as they would have been on behalf of the trustee himself.

It is argued here, and appears to have been the view of the Court of Appeals, that principles of negligence applied and that a trustee could not be surcharged under many decisions unless guilty of "supine negligence." We see no room for the operation of the principles of negligence in a case in which conduct has been knowingly authorized. This is not the case of a trustee betrayed by those he had grounds to believe were trustworthy, for these employees did exactly what it was agreed by the trustee that they should do. The question whether he was negligent in not making detailed inquiries into their operations is unimportant, because he had given a blanket authority for the operations. The liability here is not created by a failure to detect defalcations, in which case negligence might be required to surcharge the trustee, but is a case of a willful and deliberate setting up of an interest in employees adverse to that of the trust.

It is contended, however, that the trust has incurred no loss. Indeed, it is argued, and much evidence was taken to the effect, that the buying program of Darrow as a whole was to the advantage of the trust. Of course, these dealings in a rising market did not directly extract any amounts from the till of the trustee. But it is obvious that a buying program to retire at discount bonds of subsidiaries advances most rapidly and achieves its greatest results when the purchase prices are lowest. Darrow concededly relied on Miss Johnson in fixing offering prices. Those offering prices were sufficiently above what bondholders were willing to accept, so that a margin was left for Miss Johnson to profit. It may not have

been intentionally rigged for the purpose, but there can be no doubt of the result. If people were willing to trudge to the trustee's office to dispose of their holdings for less than his offer, there is no reason why the advantage of that low price should not have been taken by the trustee. Instead, in his own office, Miss Johnson intervened between the seller and the buyer and made a profit for herself by doing so.

In one of the larger transactions, a block of securities was offered at judicial sale. Darrow did not bid but Miss Johnson did. About one-half of the purchase price she obtained through a resale to Darrow. He paid her, in advance of delivery, $12,447 for securities that cost her approximately $8,000, and his check was used by Miss Johnson to make the payment due under her bid. If Darrow's employees were able to purchase in the open market these securities at less than Darrow on their advice thereafter offered and paid, it is difficult to say that there was no injury to the estate of the trust through these transactions. But equity has sought to limit difficult and delicate fact-finding tasks concerning its own trustee by precluding such transactions for the reason that their effect is often difficult to trace, and the prohibition is not merely against injuring the estate—it is against profiting out of the position of trust. That this has occurred, so far as the employees are concerned, is undenied.

It is argued, and the Court of Appeals appears to have been impressed by the argument, that this surcharge creates a very heavy liability upon a man who enjoyed no personal profit and must be condoned " 'so as not to strike terror into mankind acting for the benefit of others and not for their own.' " 184 F. 2d 1, 8. Trustees are often obliged to make difficult business judgments, and the best that disinterested judgment can accomplish with foresight may be open to serious criti-

274

cism by obstreperous creditors aided by hindsight. Courts are quite likely to protect trustees against heavy liabilities for disinterested mistakes in business judgment. But a trusteeship is serious business and is not to be undertaken lightly or so discharged. The most effective sanction for good administration is personal liability for the consequences of forbidden acts, and there are ways by which a trustee may effectively protect himself against personal liability.

The practice is well established by which trustees seek instructions from the court, given upon notice to creditors and interested parties, as to matters which involve difficult questions of judgment. In this particular matter, it is claimed that the special knowledge of Miss Johnson and Kulp was indispensable to the trustee. This, it is said, is the reason the trustee yielded to their insistence upon the right to speculate in the securities underlying the trust. If their services were so indispensable that an arrangement so highly irregular was of advantage to the trust, this might have been fully disclosed to the court and the creditors cited to show cause why it should not have been openly authorized. Instead of this, the trustee, although he did discuss with Judge Holly the employment of Kulp and Miss Johnson, did not disclose the critical fact that he was employing them on terms which permitted their trading in the underlying securities. Indeed, it appears that he did not even disclose this feature of the transaction to his own counsel. It is hardly probable that a candid disclosure to creditors, to the court, and to interested parties would have resulted in instructions to have pursued this course; but, had it been authorized, at least the assenting creditors might have found themselves estopped to question the transaction.

A further remedy of a trustee for limiting, if not avoiding, personal liability is to account at prompt intervals, which puts upon objectors the burden of raising their

objections. And had the trustee accounted, as good practice would have required, he undoubtedly would have discovered long ago that this arrangement was objectionable. It hardly lies in the mouth of a trustee to allow his liabilities to accumulate over such a period of time and then ask the court to relieve him of them because they have become too burdensome.

In fairness to the trustee, it is to be noted that there is no hint or proof that he has been corrupt or that he has any interest, present or future, in the profits he has permitted these employees to make. For all that appears, he was simply misled into thinking these persons indispensable, but he entered into an arrangement which courts cannot sanction unless they are to open the door to practices which would demoralize trusteeships and discredit bankruptcy administration.

The judgment of the Court of Appeals is reversed and the cause remanded to the District Court for proceedings consistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE BURTON took no part in the consideration or decision of this case.

MR. JUSTICE BLACK, dissenting.

The Special Master, District Court, Court of Appeals and this Court all seem to agree that the respondent trustee, Darrow, has been guilty of no act of bad faith. As a result of his administration, large profits accrued to the estate. Nevertheless, the Court now holds that respondent must be surcharged $43,000 solely because two of the trust's employees profited to that extent from trading in trust securities with his knowledge. This rule of trustee liability did not exist before today, as is shown by the fact that no statute or case is cited in support of the Court's decision.

Despite its novelty, there is much to be said in favor of such a rule for cases arising in the future. It seems to me, however, that there is no reason why the rule should be retroactively applied to this respondent when to do so is grossly unfair. Admittedly, the most that can be said against respondent is that he made an honest mistake which before today would not have subjected him to the heavy financial penalty. Under these circumstances, if the new rule is to be announced by the Court, I think it should be given prospective application only. See *Great Northern R. Co.* v. *Sunburst Oil Co.*, 287 U. S. 358 and cases cited, 85 A. L. R. 262.

I would affirm the judgment of the Court of Appeals.