In re **INTECH CAPITAL CORPORATION, Debtor.**

In re **INTECH LEASING CORPORATION, Debtor.**

**Bankruptcy Nos. 5–88–00095, 5–88–00096.**

United States Bankruptcy Court, D. Connecticut.

June 24, 1988.

Joel Lewittes, Kronish, Lieb, Wiener & Hellman, New York City, for Intech Capital Corp. and Intech Leasing Corp.

Stuart Hirshfield, Scott A. Steinberg, Shea & Gould, New York City, for Official Committees of Unsecured Creditors.

Rosemarie Matera, New York City, for U.S. Trustee.

Ronald J. Cohen, Tyler, Cooper & Alcorn, New Haven, Conn., Peter Wang, Deborah Fabricant, Friedman, Wang & Blieberg, P.C., New York City, for Fujitsu Systems of America, Inc.

## MEMORANDUM AND ORDER ON APPLICATION FOR APPROVAL OF EMPLOYMENT

ALAN H.W. SHIFF, Bankruptcy Judge.

Intech Capital Corporation seeks approval for the employment of the law firm, Kronish Lieb Wiener & Hellman, which represented that company and its wholly owned subsidiary, Intech Leasing Corporation, prior to the commencement of these chapter 11 cases. Fujitsu Systems of America, Inc., a creditor, and the Official Unsecured Creditors' Committee in each case object on the grounds that Kronish Lieb is not a disinterested person and holds an interest adverse to the estate. *See* Code § 327(a). For the reasons that follow, the objections in each case are sustained, and the application is denied.

### I

On December 15, 1987, Intech Capital and Intech Leasing filed petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. On December 21, 1987, Intech Capital filed an application to employ Kronish Lieb as attorneys for both debtors in possession. On February 5, 1988, Judge Buschman, without ruling on the application, ordered the transfer of both cases to this court. On February 21, 1988, Intech Capital filed the instant application, seeking approval of the limited employment of Kronish Lieb for the period between December 15, 1987 and February 5, 1988, so that an application for compensation under § 330 may be filed.

Sixteen Kronish Lieb partners currently hold approximately 4% of the outstanding equity security shares of Intech Capital. In addition, during 1987, the debtors paid Kronish Lieb $772,322.15 for legal services, including $150,000.00 as an advance retainer in connection with the filing of the petitions that commenced these cases.

### II

Code § 327(a) provides:

Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 327 (1982).

The disinterested person and adverse interest tests for employment of professional persons under § 327(a) overlap in that the § 101(13) definition of "disinterested person" includes a person that does not have an interest materially adverse to the interest of the estate. *See, In re Martin,* 817 F.2d 175, 180 (1st Cir.,1987) ("... the twin requirements of disinterestedness and lack of adversity telescope into what amounts to a single hallmark."). Therefore, the issues presented center on the disinterested person test as defined by § 101(13)(A) and (E).

Section 101(13)(A) defines "disinterested person" as a person that "is not a creditor, *an equity security holder,* or an insider." 11 U.S.C. § 101 (1982) (emphasis supplied). Section 101(13)(E) adds to the definition, a person that "does not have an interest materially adverse to the interest of the estate ... by reason of any direct or indirect relationship to, connection with, or interest in, the debtor ..." 11 U.S.C. § 101 (1982).

Kronish Lieb argues that its equity security holdings are *de minimus* and that this court should exercise its equitable

powers to apply a flexible approach to the statute, particularly where, as here, a full, early disclosure was made of that stock position. Kronish Lieb further argues that prepetition payments of its fee were not preferential transfers because its fee was paid in the regular course of business dealings with that firm, and, even if some of the payments were preferential transfers, that circumstance does not rise to the level of a materially adverse interest because any such preference could be avoided by the creditors' committees.

### a.

### Equity Security Holder

■ Kronish Lieb's reliance on authority applying equitable considerations to soften the otherwise draconian result of a literal application of §§ 327(a) and 101(13)(A) is misplaced. As the unchallenged argument of Fujitsu suggests, Kronish Lieb served as the debtors' attorney at its peril, because Fujitsu objected almost immediately to the initial application to employ Kronish Lieb. But more to the point, an early disclosure cannot exhonorate a prohibited relationship. This is not the case of an application that would have been approved if timely made.[1]

Kronish Lieb recognizes that the "no value" theory, whereby the equity shares of an insolvent company are claimed to have no value, has been overwhelmingly rejected. *See, Northwest Bank Worthington v. Ahlers,* —— U.S. ——, 108 S.Ct. 963, 969, 99 L.Ed.2d 169 (1988)

> We join with the overwhelming consensus of authority which has rejected this "no value" theory. Even where debts

far exceed the current value of assets, a debtor who retains his equity interest in the enterprise retains "property". Whether the value is "present or prospective for dividends or only for purposes of control" a retained equity interest is a property interest to "which the creditors [are] entitled ..." before the stockholders [can] retain it for any purpose whatever.

Kronish Lieb's *de minimus* argument, which disclaims the element of control identified in *Ahlers,* is no more persuasive.

Kronish Lieb argues that the purpose served by including equity security holders in the disinterested person test is to prevent a controlling person with a parochial interest from exercising that interest at the expense of other parties in interest. In reliance on that argument, Kronish Lieb contends that its partners have a *de minimus* stock interest which does not put the law firm in a position of control and that the court should not read the statute literally when that is not necessary to achieve its purpose.

■ While I do not favor blind adherence to the literal application of every statutory phrase and recognize the possible scenario under which a *per se* approach to the disinterested person test could produce a bizaare result,[2] this is not such a case. Here, sixteen Kronish Lieb partners [3] hold 135,-640 shares of Intech Capital's stock, representing approximately 4% of the outstanding equity security of that closely held corporate debtor.[4] While that position may arguably represent a minimal part of the whole, it is not insignificant even if the

---

**1.** *Compare Matter of Roger J. Au & Sons, Inc.,* 65 B.R. 322, 333 (Bankr.N.D.Ohio 1984) (had the attorney revealed in his application for employment that he was an officer and director of the debtor corporation, the application would have been denied as being contrary to § 327(a)) *with Connelly v. Hancock, Dorr, Ryan & Shove,* 195 F.2d 864 (2d Cir.1952) (early disclosure by trustee's attorneys of a pre-appointment representation of an adverse claim warranted approval of employment).

**2.** *See, e.g., In re O'Connor,* 52 B.R. 892, 899 (Bankr.W.D.Okla.1985) (withdrawal by debtor's attorneys not required where partners of the

firm held an "infinitesimal" .0077% equity interest in debtor).

**3.** In addition two relatives of Kronish Lieb partners own an additional 1,645 shares and former partners and their relatives (nine shareholders) own 55,404 shares.

**4.** Attorneys may be indirectly disqualified from representing a client when they are associated with other attorneys who are directly disqualified. *In re Wells Benrus Corp.,* 48 B.R. 196, 198 (Bankr.D.Conn.1985), citing Disciplinary Rule 5–105(D) of the Model Code of Professional Responsibility.

debtors continue to pursue their stated objective to file a liquidating plan.

■ The prohibition in § 101(13)(A) against the employment of equity security holders is not restricted to those who are controlling persons. Such a reading would render that prohibition a nullity since a "person in control of the debtor" is included in the definition of insider, *see* § 101(30)(B)(iii), and insiders are excluded from the definition of disinterested persons by § 101(13)(A). The flaw in Kronish Lieb's argument is that the shareholder prohibition is not dependent upon a qualitative analysis of an equity security holder's interest, *cf., In re Anver*, 44 B.R. 615, 618 (Bankr.D.Mass.1984) ("Code's definition of disinterested is nonconditioned on a requirement of substantial stock interest but merely an equity interest ..."); but rather is reflective of congressional intent to eliminate not only all conflicts of interest but also any appearance of impropriety. *In re Martin, supra*, 817 F.2d at 180 ("Section 327 is intended ... to address the appearance of impropriety as much as its substance ..."); *see also, Matter of Cropper Co., Inc.*, 35 B.R. 625, 631 (Bankr.M.D.Ga. 1983) ("Congress made it clear that equity security holders are conclusively not disinterested.").

The wisdom of excluding shareholders from those eligible for appointment under § 327(a) is hardly obscure. Attorneys quite properly exert a considerable influence upon the formulation and execution of client strategy. When that influence is coupled with a subjective interest, no matter how slight, the appearance of impropriety cannot be overlooked. Chapter 11 encourages negotiation toward a plan of reorganization. Even a liquidating plan may be the subject of considerable negotiation between various impaired classes, and an attorney/shareholder, representing the estate, might attempt to advance shareholder interests at the expense of other classes. Sections 101(13) and 327(a) prevent any such effort as well as the appearance of any such effort. "This is not because such interests are corrupt but because they are always corrupting." *Mos-*

*ser v. Darrow*, 341 U.S. 267, 271, 71 S.Ct. 680, 682, 95 L.Ed. 927 (1951)

The same logic applies to others who have or may have a personal agenda for the administration of a case. Thus, in *In re Wells Benrus Corp.*, 48 B.R. 196 (Bankr.D.Conn.1985), this court ruled that a law firm could not serve as the debtor's attorney when certain partners were officers and directors of the debtor. Contrary to Kronish Lieb's argument, that decision was not based upon a finding that the officers and directors were persons in control of the debtor but rather on a strict application of § 101(13)(D). If control had been relied upon, reference would have been made to § 101(13)(A) and (30)(B)(iii). *See also, In re Pierce*, 809 F.2d 1356 (8th Cir.1987) (strict application of § 101(13)(D) resulted in disqualification of creditor as attorney for the estate).

In the final analysis, Kronish Lieb urges this court to ignore the plain, unambiguous language of § 101(13)(A) in favor of a disinterested person test predicated upon control of the debtor. But, as noted, Congress has denominated control as only one of several bases for disqualification.

b.

. Adverse Interest

There is an independent reason for the disqualification of Kronish Lieb. In order to qualify for employment under § 327(a), a person may not hold "an interest adverse to the estate." Section 101(13)(E) defines "disinterested person" as a person that "does not have an interest materially adverse to the interest of the estate ... by reason of any direct or indirect relationship to, connection with, or interest in, the debtor ... or for any other reason." 11 U.S.C. § 101 (1982).

As noted, in 1987, Intech Capital paid Kronish Lieb $772,322.15 for legal services. Of that sum, $150,000.00 was paid as an advance retainer for filing the petitions which commenced these cases. Fujitsu and the creditors' committees argue that a materially adverse interest exists by virtue of the potential claim against Kronish Lieb that the payment of its fee was at least in

part an avoidable preference. *See,* § 547(b). Kronish Lieb, however, contends that all payments for past services were "made in the ordinary course of business", *see,* § 547(c)(2)(A), and that its claim in that regard may be tested by the creditors' committees. Kronish Lieb's position is unavailing.

■ First, it is observed that of the twelve payments for past services, listed on Item 20(b) of Intech Leasing's Statement of Financial Affairs, only the last two, made four days before the commencement of these cases in the aggregate amount of $49,417.40, were by wire transfer. It therefore appears that wire transfer was not the regular means by which Kronish Lieb was paid and that at least those transfers are a proper subject for preference avoidance litigation. *In re Antinarelli Enterprises, Inc.,* 76 B.R. 247, 251 (Bankr. D.Mass.1987) (isolated wire transfers are outside of the ordinary course of business), *citing, In re Craig Oil,* 785 F.2d 1563, 1568 (11th Cir.1986) (cashier's checks).

■ Kronish Lieb's contention that any adverse interest arising out of any preferential transfers is mitigated by the fact that the creditors' committees may institute and prosecute such claims is also unpersuasive. *See, In re STN Enterprises,* 779 F.2d 901, 904–05 (2d Cir.1985) (creditors' committee can initiate a preference action only under special circumstances). An adverse interest is not converted into an independent interest because another party might be authorized to assert a claim against the holder of that interest.

The employment of an attorney, who has a conflict of interest, "to represent or assist the trustee in carrying out the trustee's duties under [Title 11]", *see* § 327(a), would erode the confidence of other parties in the administration of that estate to say nothing of public confidence in the administration of justice in bankruptcy courts. The § 327(a) prohibition against the employment of such attorneys and other professionals is intended to eliminate that element of concern. It is not likely that confidence, undermined by lack of disinterest, would be restored simply because a credi-

tors' committee might be authorized to commence an action to avoid a transfer to the holder of an adverse interest. It is noted that § 1107(b) modifies § 327(a) so that "a person is not disqualified for employment ... by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case." 11 U.S.C. § 1107 (1982). The word "solely" compels the conclusion that Congress merely intended to eliminate prior employment as a basis for exclusion under the disinterested person test but retain all other attributes of disinterest as defined by § 101(13). *See, In re Pierce, supra,* 809 F.2d at 1363 n. 18; *In re Hargis,* 73 B.R. 622 (Bankr.N. D.Tex.1987).

### III

For the foregoing reasons, the objections of Fujitsu and the creditors' committees are sustained; the Application to Employ Kronish Lieb is denied; and IT IS SO ORDERED.