## In re FREEDLANDER INCORPORATED, THE MORTGAGE PEOPLE, et al., Debtor.

**Bankruptcy No. 88–00794–RS.**

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

Jan. 6, 1989.

See also, Bkrtcy., 86 B.R. 66.

David H. Adams, Clark & Stant, P.C., Virginia Beach, Va., for trustee.

Harry Shaia, Jr., Trustee, Richmond, Va.

## MEMORANDUM OPINION

### BLACKWELL N. SHELLEY, Bankruptcy Judge.

This matter comes before the Court upon the motion of the Trustee, Harry Shaia, Jr., seeking guidance as to whether the Trustee should continue to pursue an appeal of the decision of the district court granting summary judgment to North Carolina National Bank ("NCNB") against Freedlander, Inc., The Mortgage People ("Freedlander") and certain of the individual stockholders of Freedlander. Having concluded that the Court cannot properly advise the Trustee on this issue, the Court denies the Trustee's request for guidance.

*Introduction*

Freedlander and other related entities filed voluntary petitions under Chapter 11 of the Bankruptcy Code on April 11, 1988. On May 16, 1988 the Chapter 11 proceedings were voluntarily converted to Chapter 7, and Harry Shaia, Jr. was appointed as Trustee. The various proceedings were substantively consolidated by Order of the Court entered August 19, 1988. On February 1, 1988, Freedlander and the individual stockholders filed a lawsuit against NCNB in the U.S. District Court, premising their action on a claim of lender liability. District Judge Richard L. Williams granted NCNB's motion for summary judgment, and after a brief delay issued a memorandum opinion on August 10, 1988. 706 F.Supp. 1211.

Following this decision, the Trustee asked for and received an extension of time during which to note an appeal. During this time the Trustee petitioned this Court for guidance as to the Trustee's options in regards to this appeal. Specifically, the Trustee requested the Court's advice as to whether he should note an appeal on behalf of the estate of the debtor, whether he should abandon any interest in the lawsuit, or whether he should take no action and allow the time to note an appeal to lapse.

The Trustee was unable to notice all parties in interest and obtain a hearing date in this Court before the extended period for noting an appeal expired. As a result, the Trustee determined to note the appeal in order to keep open the option of challenging the grant of summary judgment. The Trustee came before this Court on December 9, 1988, and at that time the Court took the matter under advisement.

## CONCLUSION

As stated above, the Court has concluded that it would be improper to advise the Trustee in this matter. The Court's decision is founded upon a review of the development of the bankruptcy laws of the United States over the last 100 years. In the 20th century the trend has been toward removing bankruptcy judges from the administration of bankruptcy cases, and allowing them to serve instead as neutral arbiters of disputes. Although at one time it may have been appropriate for the bankruptcy judge to respond to trustees' requests for guidance in matters of estate administration, that time has passed.

An excerpt from the Report of the House of Representatives which accompanied the promulgation of the Bankruptcy Code of 1978 effectively relates the significant developments in the law since the Bankruptcy Act of 1898:

The system as it operates today was not enacted in its present form. It has evolved over the past 80 years from a far different system. In 1898, when the Bankruptcy Act was enacted, referees were not salaried officers of the United States. They were appointed for 2-year

terms, paid on a commission (fee) basis, and not used as extensively as they are under present law. The reference of a bankruptcy case was not automatic; the referees' orders were not given the same finality as under present law; and review of referee's decisions and orders by district judges was by "petition for review" rather than by appeal.

Referees originally were required to perform many purely ministerial functions; their judicial role was minor. The referee was not conceived of as a judge or a judicial officer, but rather as a supervisor and administrator of a bankruptcy case. His judicial functions grew from his role of administering an estate; when disagreements arose in the administration of a case, he would decide them, subject to review by the district court. Though the administration of a bankruptcy case was entrusted to a nonjudicial officer, most of the litigation that arose in bankruptcy cases in 1898 was entrusted to Federal district or State courts. The referees only decided those matters relating to property over which they had direct control, matters referred to them as special masters by judges, and matters submitted by consent of the parties. The Act vests jurisdiction "of all controversies at law and in equity, as distinguished from proceedings in bankruptcy," in the courts in which the matter in dispute would have been decided in the absence of bankruptcy.

Beginning in 1938, the position of referee began to change. The Chandler Act made the referee more of a judicial officer. It removed many of the referees' administrative duties and lodged them elsewhere, either in the trustee or the clerk. In 1946, referees were removed from the fee system and made salaried officers of the district courts. The universally deplored fee system, which gave referees an incentive to decide disputes in favor of the estate, was repealed in view of the referee's expanded judicial and diminished administrative role. When the referee was acting as a collection officer, a fee system was acceptable. When he became a judicial officer, a fee

system was wholly out of place, and possibly unconstitutional. The 1946 legislation also extended the terms of referees from 2 to 6 years. Legislation in 1966 prohibited referees from acting as trustees or receivers in bankruptcy cases, an inappropriate activity for a judicial officer.

In 1973, the Rules of Bankruptcy Procedure, promulgated by the Supreme Court on the recommendation of the Judicial Conference, went further to recognize the judicial status of referees. The title of the office was changed to bankruptcy judge. The jurisdiction over disputes was de facto expanded by a clarification of what constituted consent to jurisdiction by an adverse party. More of the bankruptcy judge's administrative duties were removed from him. The thrust of the Bankruptcy Rules, more than any change in the preceding 40 years, was to recognize the judicial character of the office of bankruptcy judge, and the primary judicial nature of the work the bankruptcy judge performs and the contact creditors and debtor alike have with the bankruptcy judge. In the words of the Judicial Conference's Advisory Committee on Bankruptcy Rules:

> [t]here has been a purpose to emphasize the judicial in contradistinction to the ministerial functions of the referee in bankruptcy administration and to enhance the dignity of the office as that of the principal judge of the bankruptcy court.

The result of these developments in the law has been to recognize the bankruptcy judge as a regular judicial official that handles only bankruptcy cases.

The Bankruptcy Code of 1978 continued the trend of relieving bankruptcy judge's of administrative duties by creating the pilot U.S. Trustee program. It was hoped that "[i]n keeping with the thrust of the bill to make the bankruptcy judge a truly judicial officer, performing primarily judicial functions, that is, the resolution of disputes, many of the supervisory functions now performed by bankruptcy judges [would be] transferred to ... the U.S.

Trustee." Remarks of Congressman Edwards, Cong.Rec. (Jan. 4, 1977) p. E19.

Under the old Act the "bankruptcy judge supervise[d] the trustee in the performance of his duties, often suggesting causes of action that the trustee might pursue to recover assets for the estate. The bankruptcy judge review[ed] nearly all transactions that trustees enter[ed] into, and rule[d], usually ex parte, on their propriety. *The bankruptcy judge frequently entertain[ed] requests for instructions from the trustees for even the most routine matters.*" House Report No. 95–595, p. 89 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787 (emphasis added).

The Congress felt that "[i]t is enough of a reason for change that these functions and duties of the bankruptcy judge constitute no part of his judicial responsibilities, and divert him from the important judicial and legal work that must be done in bankruptcy cases. However, if that were the system's only vice, adjustments less than those proposed in the bill might suffice. Deeper problems arise because of the inconsistency between the judicial and administrative roles of the bankruptcy judges. *The inconsistency places him in an untenable position of conflict, and seriously compromises his impartiality as an arbiter of bankruptcy disputes.*" House Report, *supra* at 89 (emphasis added).

The potential for unacceptable conflict inherent in court guidance of trustees can be illustrated by a hypothetical example. Suppose, for instance, that the trustee in a bankruptcy case petitioned this Court for advice as to whether the trustee should commence a preference suit on behalf of the estate. Could the Court direct the trustee to maintain the action, and to expend estate assets in the process, without in some way prejudging or appearing to have prejudged the matter? This Court believes that in such a situation it would be required to recuse itself from presiding over the preference action. Conversely, in order for the Court to direct the trustee not to bring the preference suit, the Court, in

an effort to make an informed decision, would be required to obtain some knowledge of the probabilities for success of the action, as well as the availability of funds to finance the suit. Such knowledge could be obtained only from one or more interested parties to the action, and in gathering the information for that decision the Court would likewise possibly prejudice its responsibility to preside impartially over the entire bankruptcy case.

The possibility for compromise of the Court's impartiality exists in the instant matter as well. Suppose the Court were to advise the Trustee to continue to pursue the appeal of the district court's decision. Such advice would necessarily be founded on the Court's sense that, one, summary judgment was improvidently granted, and two, the estate enjoyed a likelihood of success on the merits of its suit against NCNB. If the Fourth Circuit Court of Appeals reversed the decision of the district court, the case would be remanded, and the real possibility exists, since nearly all of the original plaintiffs to the action have filed petitions in bankruptcy, that the matter could be referred to this Court. At the very least, these circumstances would give the appearance that the Court had prejudged the action. The Court should not place itself in such an untenable position.

In support of his application for advice, the Trustee cites a number of cases which the Court finds to be unpersuasive for a number of reasons. First, nearly all of the cited decisions concern trustees' investments of estate assets. Advice given in this area is less likely to lead to the type of systemic conflict described above.[1] Second, these cases either involve pre-Code issues or fail to address themselves to the changes in the law which accompanied the promulgation of the Bankruptcy Code of 1978. Third, all but two of the cases cited are simply inapposite, in that they fail to address, in any way, the issue of court guidance of trustees.

---

**1.** Also, it should be noted that under the old Bankruptcy Act trustees were *required* to seek advice on matters concerning the investment of estate assets. Bankruptcy Act of 1898, § 75(a).

The leading case in this area is the pre-Code decision of the United States Supreme Court in *Mosser v. Darrow*, 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927 (1951). In *Mosser*, the Supreme Court, while affirming the surcharge of a trustee who permitted persons employed by him to assist in the reorganization to profit at the expense of the debtor, noted in dicta that trustees had a number of avenues open to afford them protection from liability for their actions. The *Mosser* court concluded:

> The practice is well established by which trustees seek instructions from the court, given upon notice to creditors and interested parties, as to matters which involved difficult questions of judgment.

*Mosser, supra* at 274, 71 S.Ct. at 683.

While at the time of the *Mosser* decision the practice of providing trustees with advice may have been well established, the Court, for the reasons outlined above, believes that such a practice is unwise, and perhaps impermissible, today. The Court is not dissuaded from its belief by the other cases forwarded by the Trustee. These cases, several of which issue from the Fourth Circuit Court of Appeals, cite *Mosser*, but do so in support of an entirely different proposition. *See e.g., Turshen v. Chapman*, 823 F.2d 836 (4th Cir.1978); *Yadkin Valley Bank & Trust Co. v. McGee*, 819 F.2d 74 (4th Cir.1987); *U.S., etc. v. Sapp*, 641 F.2d 182 (4th Cir.1981); *Sherr v. Winkler*, 552 F.2d 1367 (10th Cir. 1977). These cases do not contain any discussion, even in dicta, on the subject of a trustee seeking court guidance in the administration of bankruptcy cases.

In a case out of the Alexandria Division of this Court, the issue of the trustee's right to seek instructions from the court did arise in a challenge to the trustee's standing to raise the issue of a constructive trust. *In re Johnson*, 55 B.R. 800 (Bankr.

E.D.Va.1985). The trustee had objected to a proof of claim filed by the IRS, contending that he held the assets of the estate in a constructive trust for the benefit of investors who had been defrauded by the debtor and that the claim of the IRS was not timely filed. In addition to filing the proof of claim objection, the trustee commenced a declaratory judgment suit seeking to have the court declare him the constructive trustee of some of the estate assets for the benefit of certain allegedly defrauded creditors. This action was taken by the trustee in an effort to avoid being accused of impropriety in disbursing funds in his possession. The IRS argued that the trustee lacked standing to maintain the declaratory judgment action in that the action could only be properly brought by the allegedly defrauded investors. Despite the *Johnson* court's holding that the trustee was without standing to bring the action for declaratory judgment, the court in dicta cited *Mosser* and, repeating the language quoted from *Mosser* above, mentioned that "there are ways by which a trustee may protect himself against personal liability." *Johnson, supra* at 803 (quoting *Mosser, supra*, 341 U.S. at 274, 71 S.Ct. at 683).[2] In adopting *Mosser's* suggestion that trustees may properly seek advice from the bankruptcy court, the *Johnson* case fails to recognize the important changes in the law which are discussed above. Especially since the advent of the U.S. Trustee system, this Court simply cannot continue to be in the business of administering bankruptcy cases.

Notwithstanding the intent of Congress to remove the bankruptcy courts from the arena of bankruptcy case administration, as indicated in the legislative history discussed *supra*, the Code and the Rules do provide for the adjudication by the bank-

---

**2.** The Court observes that subsequent to the *Johnson* decision, the allegedly defrauded investors brought an action against the trustee asserting that certain funds held by him were not properly part of the bankruptcy estate, and that these funds should be returned to them. The trustee, who apparently elected not to avail himself of the bankruptcy court's offer of guidance, chose not to answer the complaint and instead submitted a memorandum stating his belief that he was unable in good faith to defend the action. Thereafter, the IRS intervened to defend the suit. In granting summary judgment to the investors, the bankruptcy court held that the funds in the hands of the trustee were property belonging to the class of defrauded investors and not subject to any lien of the IRS. *In re Johnson*, 80 B.R. 791 (Bankr.E.D.Va.1987).

ruptcy courts of controversies between adverse parties. For example, 11 U.S.C. § 554 permits the trustee to abandon property of the estate *after notice and a hearing,* and Rule 2002(a)(3) contemplates hearings before the court on objections to the trustee's proposed settlement of controversies.[3] Thus, the bankruptcy courts are envisioned as the forum where parties aggrieved by a trustee's proposed actions can be heard.

This Court believes, then, that if a trustee wishes to protect himself from potential liability for his actions a number of options may exist which do not require the Court to impermissibly compromise its judicial impartiality. All of these options involve noticing interested parties of contemplated courses of action and permitting them the opportunity to object. In the instant case, for example, if the Trustee wishes input in making his decision, he could notice all creditors of his intent to abandon the suit against NCNB as an asset of the estate. If any party objects, a hearing in this Court can be conducted, and all interested parties may attend and be heard. In another case, the trustee might notice all creditors pursuant to Rule 2002(a)(3) of his intent, for example, to settle or compromise a claim.

The Court's rulings upon hypothetical objections to abandonment or compromise would differ fundamentally from the order presently being sought by the Trustee. At the core of this distinction is the fact that in the case of an objection to a proposed action, the Court would have before it two or more adverse parties who would be asking the Court to apply neutral principles to settle a controversy between them. It is this role as arbiter of disputes which the Bankruptcy Code envisages as the proper one for bankruptcy courts today.

In this case the decision to abandon or pursue the appeal is one for the Trustee, not the Court. Although the Court will entertain any objections raised should the Trustee choose to notice interested parties of an intent to abandon the suit against

NCNB, the instant motion seeking guidance will be denied. An appropriate Order will issue.

---

**3.** The Court notes, however, that § 102(1) of the Code makes clear that "notice and a hearing" will be construed in bankruptcy cases as notice and *an opportunity to be heard.* An act proposed by a party may be authorized without an actual hearing if notice appropriate to the particular circumstances is given and no party timely objects and requests a hearing.