**In re BERRY PUBLISHING SERVICES, INC., Debtor.**

**Bankruptcy No. 97 B 10348.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

March 11, 1999.

Marc Sherman, Lincolnwood, IL, for Defendant.

Alex D. Moglia, Trustee/Plaintiff.

Steven Towbin, D'Ancona & Pflaum, Chicago, IL, for Trustee/Plaintiff.

### *MEMORANDUM OPINION*

RONALD BARLIANT, Bankruptcy Judge.

As required by the Barton Doctrine [1], Real Media Group, Inc. ("Real Media") is seeking leave to file suit against the Trustee in this chapter 7 case and his attorney. The claims relate to a sale of assets of this bankruptcy estate and a letter written by the trustee's attorney. For the reasons set forth below, this Court will deny leave to sue the trustee but grant leave to sue his attorney.

### BACKGROUND

Gary and Joanna Ginter and Joe and K.J. LoDico (who, for convenience, will collectively be referred to as the "Ginter Group") filed

---

[1]. That doctrine is named for *Barton v. Barbour,* 104 U.S. 126, 26 L.Ed. 672 (1881), which held that the appointing court's permission was required before suit could be brought against a receiver.

suit in the district court charging Real Media with copyright and trademark infringement (the "district court litigation"). Real Media and the Ginter Group both claim ownership of the right to publish certain booklets, including the *Christian College Handbook* ("Handbook") and the *Christian College Handbook Homeschool Edition* ("Homeschool Edition"). Those rights once belonged to the debtor in this case, Berry Publishing Services, Inc., and passed to this bankruptcy estate under § 541(a).[2] The Ginter Group claims that those rights were subject to a security interest, which the Ginter Group foreclosed after this Court modified the automatic stay. The Ginter Group purchased the rights at the subsequent sale (the "UCC Sale").[3] Thereafter, the trustee for this estate, Alex Moglia (the "Trustee"), sold all of the estate's interest in publication rights to Real Media in a § 363 sale. Now the Ginter Group alleges that it bought the rights to the Handbook and Homeschool Edition at the UCC Sale and Real Media claims that it bought those rights at the bankruptcy sale. Hence, the district court litigation.

After the commencement of the district court litigation, the Trustee's attorney, Bruce de'Medici, sent a letter to advertisers in Real Media's publications. That letter, dated June 19, 1998, stated as follows:

> As you know, on May 1, 1997, the United States Bankruptcy Court entered an order for involuntary bankruptcy relief against Berry Publishing Services, Inc. The Office of the United States trustee appointed Alex Moglia to administer Berry Publishing Services' assets. I represent Mr. Moglia in his capacity as the trustee.
>
> Mr Moglia is gathering information about your participation or intentions to participate in a magazine published by Real Me-

dia Group, Inc., entitled, "Today's Christian College and University Handbook," and it is our understanding that advertising was sold for that magazine under the guise of one of Berry Publishing Services' publications titled, "The Christian College Handbook." To assist in our administration, please submit to my office a copy of the invoice(s) from Real Media Group for your participation in that magazine and records of any payment(s) on the invoices(s). I appreciate your cooperation.

In September 1997, Joseph and K.J. LoDico and Gary and Joanna Ginter, the secured parties, foreclosed their lien on the "The Christian College Handbook," and the trustee did not sell those rights to Real Media Group.

After Mr. de'Medici sent that letter, Real Media filed a third party complaint in the district court litigation against the Trustee and his attorney and the U.S. Trustee for damages arising from the Trustee's purported failure to deliver title to the Handbook and Homeschool Edition at the bankruptcy sale and the delivery of Mr. de'Medici's letter to its advertisers.[4] The Trustee then filed this adversary proceeding against Real Media and its attorney, Marc D. Sherman, seeking to enjoin them from pursuing the third party complaint. This Court granted a preliminary injunction, finding that the Defendants violated the Barton Doctrine and the automatic stay by filing their third party complaint against the Trustee and his attorney.

Real Media then filed this motion for leave to file an action against the Trustee and Mr. de'Medici in this Court. Real Media requested leave to file claims (or counterclaims in the present adversary proceeding) against

---

**2.** Statutory references are to the bankruptcy code, 11 U.S.C. §§ 101, *et seq.,* unless otherwise indicated.

**3.** The Ginters and LoDicos were the successful purchasers at the UCC Sale. Following the sale they assigned title to the assets to Kipland Publishing House, Inc. ("Kipland"), an Illinois corporation owned by them.

**4.** After Real Media made the bankruptcy trustee, his attorney and the U.S. Trustee parties to the district court litigation, the district court referred

the matter to this Court to interpret the original security agreement and related documents in order to determine who owns the Handbook. This Court concluded that it did not have jurisdiction to decide the matter because it did not involve property of the estate and would have no conceivable effect on this estate. *In re Berry Publishing Services, Inc.,* Case No. 97 B 10348 (Bankr.N.D.Ill. July 14, 1998). The determination of who owns the Handbook or Homeschool Edition remains for the district court.

the Trustee for breach of warranty and against the Trustee and Mr. de'Medici for tortious interference with contracts and prospective business opportunities. After the Trustee responded to the motion, Real Media filed a reply with a proposed counterclaim/third party complaint ("Proposed Complaint") setting forth its claims for relief.

The Proposed Complaint contains nine counts. In Counts I and II, Real Media requests a declaratory judgment regarding whether the estate had an interest in the Homeschool Edition and Handbook and whether those assets were sold free and clear of all liens, claims and encumbrances at the bankruptcy sale. If the assets were sold free and clear, Real Media requests a mandatory injunction requiring the Trustee to defend its interest against the claims of Kipland. Counts III, IV and V allege claims of tortious interference with contracts and prospective business advantage against Mr. de'Medici and his law firm arising from the June 18th letter. Counts VI, VII and IX assert claims against the Trustee for negligent failure to supervise Mr. de'Medici and liability under the doctrine of respondeat superior. Count VIII alleges that Mr. de'Medici participated in a civil conspiracy to deliver title to the Handbook to Kipland and others.

The Trustee objects to the motion for leave to file the claims on the grounds that 1) the Trustee sold only whatever interest in the assets the estate had, without warranty, and any claims relating to that sale, however characterized, amount to a collateral attack on the sale order and are therefore barred by the doctrine of res judicata; 2) the Trustee and his attorney are immune from Real Media's claims; 3) the Trustee is not liable for the torts of his attorney; 4) Mr. de'Medici's conduct was privileged: and 5) the Counts for tortious conduct fail to state claims upon which relief can be granted.

## DISCUSSION

### Barton Doctrine

In a Memorandum Opinion entered October 14, 1998 ("Opinion") this Court held that the filing of the third party complaint in the district court litigation violated the Barton Doctrine and the automatic stay. The

Barton doctrine requires leave of the appointing court before suit can be brought against a bankruptcy trustee or his counsel. *In the Matter of Linton*, 136 F.3d 544, 545 (7th Cir.1998). Before leave is given by the bankruptcy court, the claimant must demonstrate that it has a prima facie case against the trustee. *In re Kashani*, 190 B.R. 875 (9th Cir. BAP 1995). Without such an opportunity to evaluate the merits of the claims alleged, the requirement of leave would be meaningless. The purpose of the Barton doctrine, as noted by the Seventh Circuit in *Linton*, is to protect the bankruptcy process:

> If debtors, creditors, defendants in adversary proceedings, and other parties to a bankruptcy proceeding could sue the trustee in state court for damages arising out of the conduct of the proceeding, that court would have the practical power to turn bankruptcy losers into bankruptcy winners, and vice versa. A creditor who had gotten nothing in the bankruptcy proceeding might sue the trustee for negligence in failing to maximize the assets available to creditors, or to the particular creditor. A debtor who had failed to obtain a discharge might through a suit against the trustee obtain the funds necessary to pay the debt that had not been discharged. Of course principles of res judicata and the good faith of state courts would head off the worst consequences of the kind of divided jurisdiction over bankruptcy matters that we have just described. *But a simpler and more secure protection is to require the person wanting to bring a suit in state court against a trustee in bankruptcy to obtain leave to do so from the bankruptcy court*. *Linton*, 136 F.3d at 546 (Emphasis added).

Accordingly, this Court will only grant leave to file the requested claims if it is satisfied that Real Media has set forth a prima facie case against the Trustee or Mr. de'Medici.

### Claims Relating to the Sale of Assets

#### Res judicata effect of the Sale Order

Whether the Defendants attempt to frame their theories as requests for declaratory judgments or claims for breach of war-

ranty, it is clear that any claims against the Trustee or Mr. de'Medici for damages or other relief relating to assets sold to the Defendants at the bankruptcy sale are barred by the doctrine of res judicata and amount to a collateral attack on a prior order of this Court.

On Feb 4, 1998, this Court entered an order authorizing the Trustee to sell assets to Real Media ("Sale Order"). The Homeschool Edition was included in the list of assets being sold, but the Sale Order necessarily provided that the sale was limited to the "interest of the Trustee and the estate." [5] The Sale Order also expressly provided that the Trustee made no representations or warranties. Moreover, at the hearing, prior to entry of the Sale Order, the Trustee's counsel advised Real Media that the estate may not have any interest in the assets, and that he believed that there had been a UCC foreclosure on a security interest in the Homeschool Edition. Real Media's attorney acknowledged "that those rights may be questionable. The Trustee may own all or none of the rights that the trustee purports to be able to sell today.... We are simply buying a bundle of rights in these assets as set forth in the order...." Transcript p. 6.

Notwithstanding the language in the Sale Order and its attorney's acknowledgment in open court that "those rights may be questionable," Real Media continues to claim in this Court and in the district court that the Trustee warranted title to the assets and has breached that warranty. Real Media bases its argument, in part, on language in the Bill of Sale which provides that the Trustee sells and assigns (list of publications) "free and clear of all liens, claims, encumbrances and interests."

Real Media's argument fails for at least two reasons. First the Bill of Sale and the Sale Order limited their terms to the estate's interest in those assets. It is only those interests—the estate's interests, whatever those may have been—that were sold "free and clear." [6] The Trustee could only sell whatever interest the estate had in the assets listed—which, as Real Media acknowledged at the time of the sale, may have been none.[7] Second, the Bill of Sale provided that the sale was pursuant to the Sale Order and a copy was attached thereto. A trustee is only permitted to sell assets out of the ordinary course with court approval. § 363. The Trustee's authority to sell was limited to the terms of the Sale Order and those terms clearly indicated that the sale was without warranty. Moreover, while the Sale Order authorized the Trustee to execute a Bill of Sale, that document was required to be "consistent with this Order." Any warranties of title or otherwise would have been inconsistent with the Sale Order.

The Sale Order is final and may not be collaterally attacked. *Matter of Met–L–Wood*, 861 F.2d 1012, 1018 (7th Cir.1988). In *Met–L–Wood* the trustee sued the debtor, the purchaser of assets, the purchaser's purchaser and secured creditors for fraud relating to a sale of assets. The Seventh Circuit upheld dismissal of the lawsuit stating:

> to attach to the proceeds of the sale. At the sale hearing, Mr. de'Medici explained: "The trustee's delivery of the assets to Mr. Sherman's client is free and clear of liens, and Bankers Leasing would retain any and all rights to assert liens on those proceeds."

5. It is interesting that the Handbook is not mentioned in the sale motion or order, yet Real Media claims the Trustee warranted title to that publication, as well as the Homeschool Edition, which was mentioned. It would be unusual for anyone to warrant title to an asset without even identifying that asset. For a bankruptcy trustee, who rarely give warranties of any kind, it would be particularly extraordinary.

6. The significance of the "free and clear" language was discussed in open court, with Real Media's lawyer in attendance. A third party, Bankers Leasing, claimed a security interest in some or all of the assets being sold by the Trustee at the § 363 bankruptcy sale. As frequently occurs at § 363 sales, the assets were sold free and clear of those security interests with the interests

7. What was sold depends upon an interpretation of the Ginters and LoDicos security documents. As Real Media has previously been advised by this Court, that can only be resolved by the district court. Notwithstanding this Court's prior decision that it lacks jurisdiction to decide that issue, Real Media continues to ask this Court to decide it, although this time it has framed that request in the form of a request for a declaratory judgment.

But by seeking heavy damages from the seller, the purchaser, the purchaser's purchaser (Pipin), a law firm involved in the transaction, and the secured creditors that benefitted from the sale, the suit is a thinly disguised collateral attack on the judgment confirming the sale. This may be done only by the route provided for collateral attacks on judgments. After the time for appeal had run, the validity of the sale was established, even against nonparties to the sale proceeding. *Id.*

Like the suit in *Met–L–Wood,* Real Media's request for a declaratory judgment amounts to no more than a "thinly disguised collateral attack on the judgment confirming the sale." This can be ascertained by a thorough reading of the Proposed Complaint. The Proposed Complaint includes a host of allegations of improper conduct related to the sale—other offers were not disclosed, perfection of liens was not investigated, *etc.* If Real Media believed there were improprieties relating to the sale of assets it should have raised those objections at the sale hearing. It did not and the Sale Order is now res judicata as to those objections and any related issues.

It is overwhelmingly clear that Real Media has no claims against the Trustee or his attorney for damages related to the sale of assets or failure to deliver title to the assets. Whatever assets Real Media purchased were without warranty. Real Media may not, therefore, seek damages against the Trustee or his counsel for failure to convey title to the Homeschool Edition or the Handbook, nor may it ask this Court for a mandatory injunction requiring the Trustee to defend its title in the district court litigation, nor may it bring a civil conspiracy claim against the Trustee or Mr. de'Medici for alleged conduct occurring before the § 363 Sale. However the Defendants frame their claims, to the extent they arise out of or relate to the sale of assets, they are barred by res judicata and this Court's finding that the Sale Order unambiguously provided that the sale was without warranty.

Moreover, Real Media requests that this Court determine ownership of the publications must be rejected. To put it as simply as possible, the estate has no interest in who owns the rights to the publications. The estate sold all of its interests without warranty or representation; it does not matter to the estate what those interests were or were not. The estate and its representatives are therefore not proper parties to a suit to decide that issue by way of declaratory judgment or otherwise. The issue of title as between Kipland and Real Media is before district court and this Court has previously held that it does not have jurisdiction to decide it. See *In re Berry Publishing Services, Inc.,* Case No. 97 B 10348 (Bankr. N.D.Ill. July 14, 1998). Not only does this Court lack subject matter jurisdiction under 28 U.S.C. § 1334, it also lacks personal jurisdiction over the other party claiming an interest in those assets, Kipland.

*Immunity of Trustee and his attorney*

██ There is a split in authority on the extent of a trustee's liability in his personal and official capacity. *See discussion* McCullough, *Trustee Liability: Is There Enough Protection For These "Arms of the Court?",* 103 Com.L.J. 123 (1998). It is not necessary for this Court to address the issues that have divided the courts because the Seventh Circuit has held that a trustee is "personally liable only for a willful and deliberate violation of his fiduciary duties." *In re Chicago Pacific Corp.,* 773 F.2d 909, 915 (7th Cir. 1985), *citing, Mosser v. Darrow,* 341 U.S. 267, 272, 71 S.Ct. 680, 95 L.Ed. 927 (1951). Nor is it necessary for this Court to decide whether a trustee may be liable in his official capacity for acts of negligence, because it is well established that a trustee is absolutely immune from such claims when acting pursuant to court order. *Lonneker Farms, Inc. v. Klobucher,* 804 F.2d 1096 (9th Cir.1986); *Yadkin Valley Bank & Trust Co. v. McGee (In re Hutchinson),* 5 F.3d 750, 753 (4th Cir.1993)("trustees are completely immune from suit where the trustee acts pursuant to the explicit instructions of the bankruptcy court."); *In re San Juan Hotel Corp.,* 847 F.2d 931, 940–42 (1st Cir.1988). *See also, McCullough: Trustee Liability,* fn. 79.

██ The Trustee acted pursuant to the Sale Order when he sold whatever interest the estate had in the assets of the estate.

Moreover, as set forth above, the sale was approved after complete disclosure in court of the possibility that the estate possessed no interest in the assets in question. The Trustee and his attorney are thus absolutely immune for any liability relating to the sale of assets pursuant to this Court's February 4, 1998 Order.

### Claims Arising from Mr. de'Medici Letters

Mr. de'Medici's June 18th letters to Real Media's advertisers requested copies of invoices for advertising sold "under the guise of one of Berry Publishing Services' publications," the Handbook, and told them that the Handbook had been sold to the Ginter Group, and not to Real Media. Real Media alleges in some detail that the letter was composed, printed and sent by de'Medici in cooperation with Kipland, which claims to own the rights to the Handbook. Real Media seeks to assert tortious interference claims against Mr. de'Medici for sending those letters and against the Trustee for negligent supervision and respondeat superior liability.

#### Claims against Trustee

In Counts VI, VII and IX Real Media alleges claims against the Trustee relating to Mr. de'Medici's conduct in sending the letter. The Trustee argues that he is not liable for the torts of his attorney. Real Media counters that the law of agency applies to the attorney/client relationship. That is a correct statement, but it does not follow from that rule that the Trustee is liable for Mr. de'Medici's alleged torts. In fact, Illinois law is to the contrary.

■ Under Illinois law a principal is not liable for an agents' torts, provided the agent is not an employee. *Anderson v. Marathon Petroleum Company,* 801 F.2d 936, 938 (7th Cir.1986), *citing, Gomien v. Wear–Ever Aluminum, Inc.,* 50 Ill.2d 19, 21, 276 N.E.2d 336, 338 (1971); *Kouba v. East Joliet Bank,* 135 Ill.App.3d 264, 267, 89 Ill.Dec. 774, 777, 481 N.E.2d 325, 328 (1985). Although the attorney client relationship is governed by agency principles, the attorney is considered a classic independent contractor. *Hoffman & Morton Co. v. American Ins. Co.,* 35 Ill. App.2d 97, 102–03, 181 N.E.2d 821, 823 (1st

Dist.1962). As the Seventh Circuit explained in *Anderson:*

> The reason for distinguishing the independent contractor from the employee is that, by definition of the relationship between a principal and an independent contractor, the principal does not supervise the details of the independent contractor's work and therefore is not in a good position to prevent negligent performance, whereas the essence of the contractual relationship known as employment is that the employee surrenders to the employer the right to direct the details of his work, in exchange for receiving a wage. The independent contractor commits himself to providing a specified output, and the principal monitors the contractor's performance not by monitoring inputs—i.e., supervising the contractor—but by inspecting the contractually specified output to make sure it conforms to the specifications. This method of monitoring works fine if it is feasible for the principal to specify and monitor output, but sometimes it is not feasible, particularly if the output consists of the joint product of many separate producers whose specific contributions are difficult (sometimes impossible) to disentangle. In such a case it may be more efficient for the principal to monitor inputs rather than output—the producers rather than the product. By becoming an employee a producer in effect submits himself to that kind of monitoring, receiving payment for the work he puts in rather than for the output he produces.

■ The cases cited by Real Media do not refute this rule; they do not even involve the issue of a client's liability for torts of his or her attorney. *See Lydon v. Eagle Food Centers, Inc.,* 297 Ill.App.3d 90, 231 Ill.Dec. 640, 696 N.E.2d 1211 (2nd Dist.1998); *Washington v. Caseyville Health Care Assoc. Inc.,* 284 Ill.App.3d 97, 219 Ill.Dec. 719, 672 N.E.2d 34 (5th Dist.1996). *Yugoslav—American Cultural Center, Inc. v. Parkway Bank and Trust Co.,* 289 Ill.App.3d 728, 224 Ill. Dec. 840, 682 N.E.2d 401 (1st Dist.1997). Accordingly, this Court finds that the Trustee cannot be held liable on any theory for Mr. de'Medici's alleged tortious conduct.

*See also Bennett v. Williams,* 892 F.2d 822 (9th Cir.1989)(trustee immune from claims that it negligently supervised property manager).

With respect to any direct involvement with the Mr. de'Medici's letter, the Trustee has submitted an affidavit stating that he did not direct Mr. de'Medici to send the letter and in fact had no knowledge that such a letter was being considered or sent. Mr. de'Medici's affidavit confirms that statement. The Proposed Complaint alleges nothing to the contrary. The Trustee therefore cannot be sued for any damage caused by the letter.

*Claims against Mr. de'Medici*

 The Trustee asserts that any tortious interference claims against Mr. de'Medici for sending the letters are barred by two separate privileges: 1) a privilege for investigatory work; and 2) an absolute privilege for statements made during or with respect to judicial proceedings. The premise for those arguments is that the letters were sent in furtherance of the Trustee's duties to investigate matters related to the estate, specifically to investigate potential claims by and against the estate. On the present record, however, the Court cannot find that Mr. de'Medici's conduct was privileged or justified.

 The Trustee relies upon *Weissman v. Hassett,* 47 B.R. 462 (S.D.N.Y.1985), in which the court found that a Trustee who made allegedly defamatory statements in a report prepared for the court and distributed to the press and public was protected by both absolute judicial immunity and the privilege for statements made in judicial proceedings. Both holdings were premised on the court's finding that "the investigation was part of the Trustee's duty to assemble the bankrupt estate." *Id.* at 466. Moreover, the court applied a very broad standard: The privilege "embraces anything that may possibly be pertinent or which has enough appear-

ance of connection with [a judicial proceeding] so that a reasonable man might think it relevant. All doubt should be resolved in favor of its relevancy or pertinency...." *Id.* at 468 (citations omitted). Similarly, in Illinois, "[a]bsolute privilege in defamation actions protects anything said or written in a legal proceeding, so long as it is pertinent and material to the matter in controversy." *Weiler v. Stern,* 67 Ill.App.3d 179, 181, 23 Ill.Dec. 855, 384 N.E.2d 762 (1st Dist.1978). Moreover, these broad privileges and immunities apply in bankruptcy cases (as in *Weissman* and *Schwartz v. Bartle,* 49 Misc.2d 848, 268 N.Y.S.2d 715 (1966)) and protect letters requesting information pertinent to the case (as in *Hoover v. Van Stone,* 540 F.Supp. 1118, 1121–22 (D.Del.1982); and *Schwartz* ). Nevertheless, they do not protect Mr. de'Medici in this case.

Mr. de'Medici filed an affidavit attempting to explain the reasons for the letter. He contends that the letter had two purposes: to investigate "potential" claims against the estate by advertisers, and to investigate possible claims by the estate against advertisers. Mr. de'Medici was worried that Real Media gave advertisers credits or received payments on account of advertising that ran in the publications while the Debtor still owned them. He was also concerned that Real Media, in collaboration with the Debtor's principal, may have diverted estate assets to Real Media, and that Real Media may have infringed upon or damaged the Debtor's goodwill and property rights. Those purposes are certainly pertinent to the bankruptcy case.[8] But the letter, while requesting information possibly relevant to those purposes, also contains the unqualified statements of fact that the Ginter Group foreclosed on the Handbook, and the estate did not sell it to Real Media. The clear implication of those statements is that Real Media did not own the rights to the publication for which it was charging for advertising. It is not clear how the statement to the effect that

---

**8.** It is, however, difficult to understand investigating "potential claims" against the estate, particularly with a letter dated June 18, 1998. The last date for filing proofs of claim was June 30, 1998. There would be no reason to worry about creditors who did not file proofs of claim, and communications to them, if they had no other

purpose, would not seem to be pertinent to the case. Moreover, such an investigation of creditors who did file proofs of claim may have been questionable discovery, particularly of a creditor represented by an attorney. The decision of this issue, however, rests on other grounds.

Real Media was not the owner of the Handbook was pertinent, or even remotely related, to the purported investigative purposes of the letter.

Moreover, in *Weissman* the offending statements were made in a official report prepared, filed and disseminated pursuant to a statutory duty (§ 1106(a)) to investigate and report fraud relating to the management of the debtor. Here, the offending statement concerning Real Media's right to the publication was not made in an official report required by statute and does not appear to have any pertinence at all to the affairs of the Debtor, this bankruptcy case, or the administration of this case.

For these reasons, the Court cannot presently say that the letter was protected by any privilege or immunity, or that Real Media had failed to set forth a prima facie case against Mr. de'Medici. This Court's ruling on the present motion, of course, cannot foreclose Mr. de'Medici from asserting any such defense, or any other defense, against Real Media's claims when and if they are filed. Perhaps when the facts are fully revealed it will appear that the contents of the letter were sufficiently related to the bankruptcy case to fall within the privileges and immunity Mr. de'Medici claims. This Court holds only that such a showing has not yet been made and no other reason appears from the record to deny Real Media its day in court.

## CONCLUSION

This Court finds that the claims against the Trustee and Mr. de'Medici relating to the sale of assets are barred by principles of res judicata and immunity. The tort claims against Mr. de'Medici, however, do not appear to be barred and Real Media has set forth a sufficient case to be allowed to proceed.

Real Media is granted leave to file a pleading in any court of appropriate jurisdiction setting forth the claims contained in Counts III, IV and V against Mr. de'Medici and his former law firm. The Court, however, has considerable doubt about its jurisdiction to hear such a claim, since it is not a claim against the estate or the Trustee in his official capacity. If Real Media chooses to file its claims in the bankruptcy court, this Court will require the parties to brief the jurisdiction issue.

An order will be entered granting the motion in part, as described above, and otherwise denying the motion.

### ORDER

For the reasons set forth in the Memorandum Opinion filed of even date herewith, Real Media Group's Motion for Leave to File Action Against Trustee and Trustee's Former Attorney is granted in part and denied in part, as follows:

A. Real Media Group is granted leave to file an action in an court of appropriate jurisdiction against the Trustee's former attorney, Bruce de'Medici, and his former law firm, for tortious interference with contracts and prospective business advantages, as set forth in Counts III, IV and V of the Proposed Complaint that was filed in connection with the Motion.

B. All other relief requested in the motion is denied.