In re VEL REY PROPERTIES,
INC., Debtor.

Bankruptcy No. 94–00472.

United States Bankruptcy Court,
District of Columbia.

Dec. 7, 1994.

Henry T. Keegan, for debtor.

Kevin R. McCarthy, Trustee.

*DECISION ON TRUSTEE'S MOTION FOR PERSONAL IMMUNITY AND ALTERNATIVE MOTION TO ABANDON PROPERTY*

S. MARTIN TEEL, Jr., Bankruptcy Judge.

Under the court's consideration is the Trustee's emergency motion requesting that the court grant him authority to operate the estate's property with personal immunity for violation of local housing regulations and common law tort liability to the extent caused by the estate's existing condition. For reasons explained below, the trustee's motion will be denied.

In the alternative, the trustee has requested court authority to abandon the property under § 554 of the Bankruptcy Code. For reasons explained below, that motion will be granted.

### FACTS

The trustee in this case was appointed on September 13, 1994, pursuant to a court order granting an involuntary chapter 7 petition filed against the debtors, Vel Rey Properties, Inc. The debtor in this case is a corporation whose sole activity is the management of a single 40 unit apartment house located at 1421 Chapin Street, N.W., Washington, D.C. The debtor estimates the value of the property to be approximately $150,000 to $250,000. The primary reason for the involuntary bankruptcy filed against the debtor was a $2.5 million jury verdict awarded in the D.C. Superior Court for lead paint liability.

In addition to the lead paint problem, the building appears to be in generally very poor condition and has only 50% occupancy. On November 28, 1994, the property was cited for numerous violations of the District of Columbia Municipal Regulations—Title 14, including failure to maintain the minimum temperature in the building; failure to maintain continuous hot water for the residents; failure to provide smoke detectors; and failure to provide and maintain a secure front door. The trustee also represents that the property is infested with rats.

On October 17, 1994, the trustee filed a motion for authority to use the property, to collect any rents, and to maintain it in preparation of final sale. Due to the potential difficulty in getting liability insurance, the trustee also sought court authority to use the property free and clear of all personal liability for existing conditions at the property. The court granted the trustee's request to use the property, but based on *Saravia v. 1736 18th St., N.W., Ltd. Partnership,* 844 F.2d 823 (D.C.Cir.1988), the court denied the trustee's request to use the property free and clear of all personal liabilities. The trustee is concerned not only about liability to the District of Columbia for violating D.C. housing regulations but he is also concerned about common law liability founded on, for example, harm befalling a visitor or tenant because of inadequate security or heating.

The trustee has now moved for guidance with regard to management of the property. The trustee asserts that he is unwilling "to continue to operate the property without an order authorizing them to operate the property to the extent of available funds pending its sale or other disposition, subject to the trustee's discretion concerning which administrative expenses to pay, with *personal immunity from all liabilities arising directly or indirectly out to the estate's inability to pay out of current cash resources all administrative expenses including such as may be necessary to maintain the Property in accordance with applicable law.*" In the alternative, the trustee requests permission to abandon the property.

The trustee urges the court to grant the motion for immunity rather than to permit abandonment because he believes the property has equity over and above the avoidable liens and will, thus, generate a return for the unsecured creditors. However, the trustee contends that in order to generate the surplus value for the unsecured creditors, he needs time to sell the property and to set aside avoidable liens. Conversely, according to the trustee, if the property is simply sold in foreclosure by the secured creditors, no value will remain for the unsecured creditors.

## I. *TRUSTEE'S MOTION FOR PERSONAL IMMUNITY*

The trustee's request presents a difficult question for the court, requiring a review of an unsettled area of bankruptcy law. However, based on the court's review, the trustee's motion must be denied.

### A

■ The court must first determine whether the D.C. housing regulations apply to property in bankruptcy. The court concludes the regulations do apply.

28 U.S.C. § 959 provides:

(a) Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect any of their acts or transactions in carrying on business connected with such property....

(b) ... [A] trustee, receiver or manager appointed in any case pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

28 U.S.C. § 959. Section 959 was intended to negate the idea that a trustee "could ignore the rules of law of the state of operation affecting the conduct of the business committed to his charge" in order to maximize the return for the unsecured creditors. *See Palmer v. Webster & Atlas Nat'l Bank*, 312 U.S. 156, 166, 61 S.Ct. 542, 546–47, 85 L.Ed. 642 (1941) (interpreting 28 U.S.C. § 124, predecessor to § 959).

In *Saravia*, the D.C. Circuit Court of Appeals, relying on 28 U.S.C. § 959(b), held that the debtor's estate must " 'manage and operate the property ... according to the valid laws of the [jurisdiction] in which such property is situated....' 28 U.S.C. § 959(b)." 844 F.2d at 826. In the case, the court concluded that the rejection of the tenants' leases by the debtor did not relieve the debtor of the obligation to comply with the requirements imposed by the District of Columbia housing code for the benefit of public health and safety. The court reasoned that bankruptcy was not meant to be an automatic shield for the estate from state laws regulating health and safety. *Id.* at 827 (citing *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection*, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986)).

Some courts have limited the application of § 959(b), particularly in the environmental liability area. These courts conclude that based on the language in the statute, that the trustee "shall manage and operate the property," the requirement to abide by state laws is limited to property that the trustee is actually managing and operating rather than property the trustee is merely liquidating. *See, e.g., Midlantic*, 474 U.S. at 505, 106 S.Ct. at 761; *In re N.P. Mining Co., Inc.*, 963 F.2d 1449, 1460 (11th Cir.1992); *In re Corona Plastics, Inc.*, 99 B.R. 231, 235 (Bankr.D.N.J.1989); *In re Thomas Solvent Co.*, 44 B.R. 83, 87–88 (Bankr.W.D.Mich. 1984). This interpretation, however, has been limited to cases where the "debtor's business operations have ceased and its assets are being liquidated." *See In re N.P. Mining*, 963 F.2d at 1460.

In this case, the trustee is not liquidating the property. Rather, the trustee is requesting court approval to manage and operate the property, within the meaning of § 959(b), in order to increase the sale value of the property. The trustee intends to run the building as a going concern, continuing to rent out the apartments and collect the rent, while he attempts to avoid liens and arranges an orderly sale of the building. Therefore, under *Saravia*, the trustee, standing in the shoes of the owner, would be required to comply with the D.C. housing regulations.

The District of Columbia housing regulations are provided in the District of Columbia Municipal Regulations—Title 14, under which the owner of the premises is required to maintain the premises in compliance with various health and safety regulations. The requirements include maintaining the premises free of hazardous amounts of lead paint, § 707.3; maintaining a ratproof condition, § 804.1; maintaining a minimum tempera-

ture, § 501.4; maintaining a continuous supply of hot water, § 606; maintaining secure exterior doors, § 705.5; and maintaining smoke detectors, § 904.4. *See* D.C.Mun. Regs. tit. 14 (1986). Under § 105 of the regulations, the city is required to give notice of violations to the owner, ordering correction. The owner must be given a reasonable time to correct the violation and this time must be indicated in the notice. § 105.2(c). If the owner fails to correct the violations within the prescribed time and is convicted, he "shall" be found liable for a fine not to exceed $300, or by imprisonment for not more than 90 days. § 102.1. Each and every day a violation continues constitutes a separate offense. § 102.6.

The trustee requests the court grant him personal immunity from liability for noncompliance with these housing regulations. It is to this question the court turns next.

## B

The question of whether the court has the authority to grant the trustee personal immunity from liability for violation of the D.C. housing regulations requires a two pronged analysis. The first question must be whether the court, despite the directive under § 959(b), has the authority to authorize the trustee to operate the property in violation of the housing regulations. In order to grant the trustee personal immunity for violation of the housing laws, the court must presume that the trustee is going to violate those very same laws. Otherwise, the trustee would not need any immunity. So, in order to grant immunity from the liability under the law, the court must first authorize the trustee to operate in violation of the law. It is not until this first question of authority is answered that the court can turn to the second prong of the analysis, which is whether the court has the authority to grant prospectively personal immunity for the trustee.

 The court concludes that under § 959(b) it does not have the authority under the first prong to authorize the trustee to operate the property in violation of D.C. housing regulations. Therefore, the court concludes that, with regard to prong two, without authority to violate the law, the trustee is simply asking the court to determine whether the trustee would face personal liability if he did indeed operate the property in violation of the law. The court has no authority to decide this issue by way of a motion: it cannot enter a declaratory judgment binding on the District of Columbia other than by way of an adversary proceeding. Nevertheless, the question is of some relevance to the abandonment issue.

Turning now to the first prong of the analysis described above, the court must consider the question of whether it has the authority to authorize the trustee to violate D.C. law. Specifically, can the court authorize the trustee to operate the property in violation of various provisions of the D.C. housing regulations and thus override the requirements of § 959(b)? As stated above, the court concludes it can not.

In *Gillis v. California,* 293 U.S. 62, 55 S.Ct. 4, 79 L.Ed. 199 (1934), the Supreme Court concluded that under 28 U.S.C. § 124, the predecessor to § 959(b), Congress withheld "from the District Courts the power to authorize receivers in conservation proceedings to transact local business, contrary to state statutes obligatory upon all others." at 66, 55 S.Ct. at 5. In *Gillis,* the court appointed receiver had difficulty complying with California statutes requiring a bond and license to continue to operate the debtor oil company. The trustee reported his circumstances to the appointing district court, stating that "unless the business could continue substantially as theretofore, the purpose of the receivership would be frustrated." *Id.* at 64, 55 S.Ct. at 5. Accordingly, similar to the trustee in this case, the receiver "asked authority to proceed without bond or license," reasoning that the alternative would be "final liquidation at material loss to all concerned...." *Id.* The district court granted the receiver's request, permitting him to operate "without any such bond or the giving of security in any other manner for the payment of such gasoline taxes and without any license." *Id.* The Ninth Circuit Court of Appeals reversed the district court under 28 U.S.C. § 124, predecessor to § 959(b), and the Supreme Court affirmed the reversal.

The Supreme Court reasoned that under 28 U.S.C. § 124, Congress had clearly withheld from the courts the right to empower receivers in conservation proceedings to disregard local statutes. The Court was untroubled by the receiver's argument that "it is impossible for the receiver to comply with the prescribed requirements; and, unless relieved from them, he 'must cease receivership operations that are essential to the conservation of assets and the general purposes of the receivership.'" *Id.* at 65, 55 S.Ct. at 5. The Court simply responded that "if the receiver cannot continue to carry on the Company's business according to the plain direction of Congress, *he must pursue some other course permitted by law.*" *Id.* at 66, 55 S.Ct. at 5 (emphasis added).

The trustee encourages the court to consider cases where the courts have granted immunity to the trustee for discretionary acts taken within the trustee's authority. *See Bennett v. Williams,* 892 F.2d 822, 824 (9th Cir.1989); *In re Jacksen,* 105 B.R. 542, 545 (9th Cir. BAP 1989). The court finds these cases inapposite because they deal with the trustee's fiduciary liability to creditors rather than liability to third parties for violation of the law.

The cases cited by the trustee are the progeny of the Supreme Court's decision in *Mosser v. Darrow,* 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927 (1951). In *Mosser,* the Court found a trustee personally liable *to the estate* for improper profits made by his employees from trading in certain estate securities. *Id.* at 274, 71 S.Ct. at 683 (emphasis added). The Court recognized that the decision created a "very heavy liability upon a man who enjoyed no personal profit and . . ." had been guilty of no bad faith. *Id.* at 273–74, 71 S.Ct. at 683. Nonetheless, the Court concluded that "[t]he most effective sanction for good administration is personal liability for the consequences of forbidden acts, and there are ways which a trustee may effectively protect himself against personal liability." *Id.* at 274, 71 S.Ct. at 683.

The Court went on to explain, in dicta, that the trustee may avoid liability of this sort by "seek[ing] instructions from the court, given upon notice to creditors and interested parties, as to matters which involve difficult questions of judgment." Significantly, the Court stated that such consultation with the court was no guarantee of approval of the proposed course of action. "It is hardly probable that a candid disclosure to creditors, to the court, and to interested parties would have resulted in instructions to have pursued this course." *Id.* The Court concluded only that "had it been authorized, at least the assenting creditors might have found themselves estopped to question the transaction." *Id.*

Courts, including those cited by the trustee, have used the dicta in *Mosser* to support the conclusion that "a trustee, who obtains court approval for actions under the supervision of the bankruptcy judge, is entitled to derived judicial immunity." *See In re Jacksen,* 105 B.R. at 545, and cases cited. In considering motions for court approval, these courts "are deferential to business management decisions of a bankruptcy trustee and have held trustees immune from collateral attack for acts of mismanagement when the trustee was acting within his court authorization." *Bennett,* 892 F.2d at 824, and case cited.

■ Clearly, the trustee is entitled to tremendous leeway in the exercise of his discretionary business judgment when operating the debtor's business. However, as indicated by *Gillis,* this leeway does run to the point of violating the law. The cases cited by the trustee make a clear distinction between trustees acting within their authority and trustees acting in excess of their authority. *Bennett,* 892 F.2d at 824; *In re Jacksen,* 105 B.R. at 544. Unlike the business judgment area, the court has no authority to authorize the trustee to operate in violation of the law, with or without consultation with this court. Hence, there is no derived judicial immunity possible in a case, such as this one, where the trustee is seeking court approval to violate the law.

Accordingly, the court concludes that it simply has no authority to grant the trustee's request. Under § 959(b), the property must be managed and operated in compliance with D.C. housing regulations. And under *Gillis,*

the court has no authority to waive that requirement for the trustee.[1]

The second prong of this analysis is whether the trustee would actually be subject to any personal liability for the violation of the housing regulations. The court considers this question only briefly because, as explained above, at this juncture the question requires an advisory opinion, which the court does not issue. It appears that the trustee arguably could be subject to personal liability for operation of the estate in violation of the D.C. housing regulations.

As explained above, building owners, and hence the trustee, can be personally liable for failure to maintain the premises in compliance with various D.C. housing regulations. If the owner fails to correct the violations within the prescribed reasonable time, he will be personally liable for a significant fine or prison term for every day the premises remains in violation.

If D.C. law allows financial inability to comply to be a defense, then no liability exists.[2] But the trustee cannot obtain insurance and is unwilling to take the risk that D.C. law would not allow such a defense. The court will thus assume that there is personal liability of an owner and thus the question is whether a trustee can suffer such personal liability as owner.

■■■ The cases discussing the personal liability of trustees are inconsistent. Com-

pare *Sherr v. Winkler*, 552 F.2d 1367 (10th Cir.1977) (trustee only personally liable for acts determined to be willfully and deliberately in violation of his duties) *with In re Cochise College Park, Inc.*, 703 F.2d 1339 (9th Cir.1983) (trustee is subject to personal liability for not only intentional but also negligent violations of duties imposed on him by law). However, based on the above analysis of *Mosser*, the court is inclined to conclude that because the trustee is personally liable for actions taken outside the scope of his authority, he is personally liable for violations of state law, to the extent that under such state law the estate's financial impossibility of compliance provides no defense to liability. This is because such violations are clearly outside the scope of his authority under *Gillis*. Thus, federal law might not immunize trustees from personal liability for violations of state law while acting as officers of the court. *See State of Wisconsin v. Better Brite Plating, Inc.*, 168 Wis.2d 363, 483 N.W.2d 574, 584 (1992) (dissent) (suggesting a distinction between liability versus immunity). But the court finds no need to explore such a question in a more definitive fashion because it cannot bind the District of Columbia and is only exploring the question for purposes of whether abandonment is advisable.[3]

■■■ In summary, the underlying theme in *Gillis* is that the intent of § 959(b)

1. In researching this question, the court found a case, *Federal Home Loan Mortgage v. Spark Tarrytown, Inc.*, 829 F.Supp. 82 (S.D.N.Y.1993), in which a court did grant the receiver immunity from personal liability while directing him to proceed diligently to repair a building in order to put it in compliance with health and safety regulations. The court finds the case inapposite because the receiver in that case was merely managing the building during a brief period pending a mortgage foreclosure sale. In such a case, the trustee is merely holding the building temporarily as an agent for the court pending the imminent sale of the building. In the present case the trustee is not temporarily managing the building pending a foreclosure sale. Rather, he is operating the building as a going concern *in order to avoid a foreclosure sale* and thus sell the building sometime in the future, so as to maximize the return for the unsecured creditors.

2. Perhaps, financial hardship can be addressed within the appeals process when considering the

"reasonableness" of the time provided to correct the violation. Furthermore, the Variance provisions under § 109 of the regulations provides for a variance only in the case of "structural or mechanical difficulty, or impracticability of bringing the premises affected into full compliance with the requirements of this subtitle." The financial impossibility of the estate's coming into compliance may be just such an "impracticability."

3. The above analysis refers, of course, only to the Trustee's actions from this point forward. Prior to this point the Trustee has been diligent in his efforts to assess the situation at the property and has promptly appeared before the court. The Trustee should not be found strictly liable for this sort of behavior under the D.C. housing regulations, which requires that the owner be given a "reasonable time" to comply with the regulations. *See* D.C.Mun.Regs. tit. 14, § 105 (1986).

was to prevent the trustee's unfettered maximization of return for the unsecured creditors. Rather, § 959(b) forces the trustee to pursue financial return within the confines of state law. In a general sense, this is to ensure that bankrupt parties do not gain an unfair competitive advantage in the market by operating behind the shield of the bankruptcy laws in contravention of state law. However, where the law is designed to protect health and safety, § 959 takes on an even greater significance. Clearly, public policy demands that the trustee not be permitted to, as here, operate property in violation of health and safety laws merely in order to boost the value of property for the benefit of the unsecured creditors. Why should the tenants be forced to live in a rat infested building with no heat, cold water and poor security simply to maximize the return of the creditors? They should not, and § 959(b) mandates that the court and the trustee may not force them to do so. This is not the purpose of the bankruptcy laws. As stated in *Gillis*, the trustee is only permitted to pursue a course of operation in compliance with the state laws. In the event that the trustee finds that operation in compliance is impossible, then "he must pursue some *other course* permitted by law." *Id.* 293 U.S. at 66, 55 S.Ct. at 6.

▬▬▬ Although the Court, in *Gillis*, did not provide any examples of what "other courses" might be available to the trustee, there are some available. First, if the trustee has concluded that there is equity in the property, then he should be able to pursue emergency bank credit, which could be used to fund compliance with D.C. housing regulations. The trustee is authorized to obtain postpetition funding for the estate under § 364, and this funding can be obtained on an expedited basis if necessary to "avoid immediate and irreparable harm to the estate." *See* F.R.Bankr.P. 4001(c)(2). Second, if unable to obtain postpetition credit, the trustee could move to abandon the property under § 554. The court discusses this option fur-

ther below when considering the trustee's abandonment motion. Third, the trustee could choose unilaterally to continue not to bring the property into compliance in the belief that the estate's dire finances would provide a defense to a charge of violation for non-compliance. Or he could seek to obtain assurances from the District of Columbia that he will not be subject to personal liability based on the estate's inability to fund compliance. *See* note 2, *supra.* But the District may be of the view that the interests of the tenants would be served by the property being sold promptly at foreclosure to an entity able to devote the capital necessary to address the property's problems.

▬▬▬ A few other more drastic possibilities would be for the trustee, concerned about personal liability, to simply withdraw from the case and request the U.S. Trustee serve in his place under § 701.[4] Furthermore, if the U.S. Trustee is unwilling to serve, the court could simply dismiss the case for cause under § 707. *See Ohio v. Commercial Oil Serv. Inc.*, 58 B.R. 311 (Bankr. N.D.Ohio 1986), *aff'd*, 88 B.R. 126 (N.D.Ohio 1987) (chapter 7 trustee's and court's lack of experience in cleaning up hazardous waste, as well as concerns for public's health, safety and welfare constitute cause under § 707 for dismissal of case). As the Court stated in *Gillis*, bankruptcy is not intended to be a haven for law breakers. If the debtor can not be liquidated or reorganized in compliance with state laws, then bankruptcy is not the place for the debtor.

### C

▬▬▬ The trustee's dilemma is even more heightened in the case of common law liability to visitors or tenants than in the case of liability to the District of Columbia. He can turn to the District and ask for an exemption from housing violations liability but he can not readily do so in the case of tenants or visitors. Although tort law may supply a defense of reasonableness based on financial

---

4. The issue of immunity of the U.S. Trustee is unclear. It appears somewhat inconsistent to the court to allow the U.S. Trustee to operate the property immune from personal liability due to general sovereign immunity or an immunity for federal executive officers but not allow the court-appointed trustee to operate with the same personal immunity. Logically, both trustees should be operating under the same incentive to comply with state law.

inability to comply with usual standards of conduct, the trustee wants blanket assurance that he will not be held liable. The court can give no advisory opinion regarding whether he will be liable or enjoy immunity. In assaying the possibility of personal liability, for purposes of whether abandonment is the appropriate course, the same analysis outlined in part B above applies.

### D

Of the options available to him, the trustee has moved, in the alternative, to abandon the property. Having denied the trustee's first motion, the court now turns to consider this alternative motion.

### II. TRUSTEE'S MOTION FOR PERMISSION TO ABANDON THE PROPERTY

The trustee has moved in the alternative to abandon the property under § 554. The effect of abandoning the property would be to revest ownership and control in the debtor. The secured lienholder would then be free to foreclose upon the property and sell it at a foreclosure sale. The ultimate title holder after abandonment, whether the debtor, the lienholder or some third party purchaser, would be required to comply with the D.C. housing regulations. *See Ohio v. Kovacs,* 469 U.S. 274, 285, 105 S.Ct. 705, 711, 83 L.Ed.2d 649 (1985).

 In order to abandon property under § 554, the trustee must show that the property is burdensome to the estate or of inconsequential value. Clearly, the court should give deference to the trustee's judgment in such matters. The only restriction on the trustee's explicit statutory authority to abandon burdensome property of the estate is the public health and safety exception created by the Supreme Court in *Midlantic National Bank v. New Jersey Dep't of Environmental Protection,* 474 U.S. 494, 507, 106 S.Ct. 755, 762, 88 L.Ed.2d 859 (1986). The *Midlantic* exception is a narrow one, however, to be applied only in cases in which there has been a showing of an "imminent and identifiable harm to the public." *Id.* at 507 n. 9, 106 S.Ct. at 762 n. 9. In *Midlantic,* the court held that the sites—waste oil facili-

ties—clearly posed a very serious threat to the public, because the facilities contained approximately 470,000 gallons of oil contaminated with PCB's, a "highly toxic carcinogen." *Id.* at 497, 106 S.Ct. at 757. Furthermore, the abandonment of those facilities "aggravated already existing dangers by halting security measures that prevented public entry, vandalism and fire." *Id.* at 499 n. 3, 106 S.Ct. at 758 n. 3. The Court reasoned that by abandoning the contaminated property, the trustee was imprudently releasing the property back to the insolvent debtor, who would be unable to facilitate cleanup, and thus the state would be burdened ultimately with the responsibility. *Id.* at 507, 106 S.Ct. at 762. Accordingly, the Court denied the trustee's abandonment motion under § 554. *Id.*

In light of the rather extreme circumstances in *Midlantic,* most courts have allowed abandonment after determining no "imminent and identifiable harm to the public" exists. *See, e.g., In re L.F. Jennings Oil Co.,* 4 F.3d 887 (10th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1372, 128 L.Ed.2d 48 (1994) (abandonment proper where property not immediate threat to public health or safety, citing as evidence lack of listing on state's list of contaminated sites); *In re Smith–Douglass, Inc.,* 856 F.2d 12, 15–17 (4th Cir.1988) (trustee only required to "take adequate precautionary measures to ensure that the public is not threatened" before abandonment); *In re Anthony Ferrante & Sons,* 119 B.R. 45, 49–50 (D.N.J. 1990) (trustee allowed to abandon contaminated public water system in contravention of state's environmental regulations absent showing of imminent and identifiable harm to public from such abandonment).

 In this case, the trustee is attempting to abandon a building cited for various violations of the D.C. housing regulations. The first step under § 554 is to consider whether the building is burdensome to the estate or is of inconsequential value. The trustee urges that this building is burdensome to the estate due to housing regulation liability and the trustee's inability to secure an insurance policy to protect himself from personal liability. As explained above, the

only way for the building to generate value for the estate would be to run it in violation of the law. Accordingly, the court accepts the trustee's representations that the building is burdensome to the estate in the following sense. The threat of personal liability, in the event of administrative claims exceeding the trustee's predictions, will deter any trustee from serving and hence likely lead to dismissal, with no administration of what other assets the estate may possess and with no pursuit of whatever possible preference or fraudulent conveyance claims the estate may have. True, the estate might be able to generate equity if the trustee could operate the property with immunity for himself (but not the estate) for liabilities based on housing code violations. But the United States Trustee has not opposed the abandonment motion, nor has anyone else, and no one appears willing to serve as trustee without personal immunity. Hence, the property is a burden to the estate. Moreover, the value is insufficient to permit the trustee to obtain financing with which to operate it. This demonstrates inconsequential value.

 The second step under § 554 is to consider whether the *Midlantic* health and safety exception to abandonment applies to this case. The court concludes it does not. The *Midlantic* exception arose from a case addressing abandonment of property contaminated with toxic waste that posed a significant threat to the public's health and safety, the abandonment of which would further exacerbate an already bad situation. Subsequent cases applying the exception have, similarly, involved courts facing the conundrum of toxic waste and high public risk. The court knows of no case, however, where the exception has been applied to circumstances like this case where the building to be abandoned is in violation of housing regulations. The court believes that this is not the appropriate circumstance to apply the *Midlantic* exception. Although the threats posed by lead paint and the other violations are clearly serious, they do not compare with the unpro-

tected lagoons of flammable toxic waste in *Midlantic*. Furthermore, abandonment of this building will actually improve the likelihood of compliance, rather than lessen it, as was the case in *Midlantic*. In this case, the lienholder or a third party purchaser at a foreclosure sale should have the necessary funds to put the building in requisite compliance with the housing regulations.[5]

Accordingly, the trustee's motion to abandon the property shall be granted.

---

5. The Court supported its holding in *Midlantic* with § 959(b) but recognized that it did not directly apply to the case because the trustee was abandoning the property and not managing it. As discussed earlier, several courts have similarly held that § 959(b) does not apply to property being abandoned. Accordingly, if the trustee moves swiftly to abandon the property, he may do so without concern for the D.C. housing regulations.