706 So.2d 1156 (1997)
Ex parte Max C. POPE, Sr., as trustee of the bankruptcy estate of Apex Coal Corporation.
(Re Max C. POPE, Sr., as trustee of the bankruptcy estate of Apex Coal Corporation
v.
WARCO, INC., et al.).
1951366.
Supreme Court of Alabama.
November 14, 1997.
*1157 J. Gusty Yearout and C. Jeffery Ash of Yearout, Myers & Traylor, P.C., Birmingham, for petitioner.
H. Thomas Wells, Jr., Jayna Partain Lamar, and J. Alan Truitt of Maynard, Cooper & Gale, P.C., Birmingham, for respondents Gulf States Paper Co., Warco, Inc., and William A. Walker.
ALMON, Justice.
Max C. Pope, Sr., as trustee of the bankruptcy estate of Apex Coal Corporation ("Apex"), is the plaintiff in an action pending in the Jefferson Circuit Court. He petitions for a writ of mandamus directing that court to set aside its order granting the defendants' motion to compel arbitration of Apex's claims.
Apex entered into a contract with Warco, Inc., the predecessor of Gulf States Paper Corporation, by which Apex was to extract coal from land owned by Warco. At issue is the arbitrability of the dispute that arose between the parties when Apex discovered that Warco and Gulf States had charged it a brokerage fee for each ton of coal Apex mined. Apex asserts that the contract does not provide for any such brokerage fee, and our reading of the contract discloses no such provision.
Under Apex and Warco's "Agreement for Coal Extraction Services," Apex was to receive 80% of the sales price for the coal that it mined from Warco's land. The Agreement contained two provisions for arbitration, one in paragraph 6 and the other in paragraph 23:
"SIXTH: In the event of any differences of opinion or any controversy between Warco and [Apex] as to whether mining operations are being conducted in accordance with the provisions of this Agreement, such difference shall be arbitrated in the following manner: The parties hereto hereby agree to abide by the written findings of the majority of three mining engineers *1158 as arbitrators, one of whom shall be appointed by Warco, one by [Apex], and the third jointly by the two first chosen...."
"TWENTY-THIRD: [Apex] and Warco shall, each six (6) months from the beginning date of this Agreement, review the sum paid for the services rendered Warco by [Apex] and specifically consider such matters as the state of the coal market, adjusted costs as might affect [Apex] including employee wages, benefits, equipment repair and maintenance costs, fuel costs, and unanticipated taxes and reclamation requirements, which adjusted cost shall be considered in granting a change in the sum paid for [Apex's] services. In the event after thirty (30) days, the parties cannot agree as to the adjusted price, arbitration as heretofore provided in this Agreement shall be instituted to resolve the questions."
Apex filed for Chapter 11 bankruptcy protection in 1992, and in December 1993 it discovered that Warco had charged Apex a brokerage fee in the amount of $2.00 per ton for coal delivered under the Agreement. In April 1995, Apex's Chapter 11 bankruptcy case was converted to a Chapter 7 liquidation case. In August 1995, Pope, as the trustee in bankruptcy, commenced an action on behalf of Apex against Warco, Gulf States, William A. Walker (the manager of the minerals business for Gulf States), and fictitiously named defendants, alleging breach of contract, fraud, suppression, deception, conversion, and willful and wrongful interference with a business relationship. All these claims pertained to the charging of the brokerage fee, which, Apex alleges, "is not provided for in the Agreement for Coal Extraction Services and is contrary to the express provisions of same." The defendants moved to compel arbitration and to stay discovery, and the circuit judge granted the motion on the ground that the arbitration provision in Paragraph 23 was broad enough to cover the dispute over the brokerage fee.
The Federal Arbitration Act (FAA) provides, in pertinent part:
"A written provision in any ... contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."
9 U.S.C. § 2.
However, parties will not be required to arbitrate any dispute that they did not agree to arbitrate. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 945, 115 S.Ct. 1920, 1925, 131 L.Ed.2d 985, 994 (1995); Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 57-58, 115 S.Ct. 1212, 1216, 131 L.Ed.2d 76, 84 (1995); Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 479, 109 S.Ct. 1248, 1256, 103 L.Ed.2d 488, 500 (1989); A.G. Edwards & Sons, Inc. v. Clark, 558 So.2d 358, 361 (Ala.1990); Ala.Code 1975, § 8-1-41(3).
Apex and Warco did not agree in Paragraph 6 to submit the instant dispute to arbitration. That paragraph provides for arbitration of disputes regarding mining operations, and the charging of a brokerage fee has nothing to do with the mining operations.
The circuit court held that the dispute was arbitrable under Paragraph 23, because that paragraph refers to disputes over "the sum paid for ... services." However, the full phrase is "the sum paid for the services rendered Warco by Contractor [Apex]." If a "brokerage fee" were provided for, it would presumably be a sum paid by Apex (or deducted from a payment to Apex) for services rendered Apex by Warco. The language of the paragraph and of the contract in its entirety reveals that the parties expressed no intention to submit a dispute such as this one to arbitration. The paragraph provides that arbitration will be instituted "[i]n the event after thirty (30) days, the parties cannot agree as to the adjusted price." The "adjusted price" refers to the price of the coal, and the adjustments referred to are changes in market conditions, costs, and such factors affecting the cost and value of the coal itself that were not foreseeable *1159 at the time the contract was executed. This provision contemplates a bargaining process for adjustments in prices based on changing conditions, and a submission of a proposed adjustment to arbitration if the parties cannot agree during that process. It does not provide for arbitration of any and all disputes arising out of the contract that may affect the sums that Warco pays Apex. It certainly says nothing about arbitration of a claim that Warco breached the contract and committed fraud and conversion by deducting unauthorized sums from the amount paid to Apex.
For the foregoing reasons, the dispute does not come within the terms of the two limited arbitration clauses in the contract.
Warco and Gulf States also argue that Apex agreed to arbitrate this dispute, in a June 21, 1994, letter from its president, Jerry W. Williams, to Gulf States. In opposition to the motion to compel arbitration, however, Williams gave an affidavit in which he stated the following regarding that letter:
"I withdrew my request to arbitrate the dispute regarding the brokerage fee because Gulf States/Warco agreed to renegotiate the agreement. Gulf States/Warco did not object to my withdrawing this dispute from arbitration."
This action was filed on August 4, 1995, more than a year after Williams had sent his letter suggesting arbitration of the brokerage fee dispute. According to Williams's affidavit, Gulf States, rather than submitting the controversy to arbitration, back at the time when Williams wrote the letter, offered to "renegotiate the agreement." After a failure of such negotiations, it cannot now invoke an earlier suggestion of arbitration by the then president of Apex.
Moreover, Apex is in bankruptcy, and this action has been filed by the trustee of the bankruptcy estate. The trustee is charged with a duty to administer the bankruptcy estate in the exercise of his sound discretion. "Clearly, the trustee is entitled to tremendous leeway in the exercise of his discretionary business judgment when operating the debtor's business." In re Vel Rey Properties, Inc., 174 B.R. 859, 864 (Bankr. D.D.C.1994). In exercising this discretion, he should not be bound by earlier contrary actions of the corporate officers that have not led to any detrimental reliance by another party. "[I]t is clear that the conduct of the Debtor cannot operate as an estoppel against the Trustee." Matter of Munzenreider Corp., 34 B.R. 82, 85 (Bankr.M.D.Fla.1983). Gulf States, far from relying on Williams's letter proposing arbitration, instead suggested a "renegotiation" of the brokerage fee. Under these circumstances, the trustee of Apex's bankruptcy estate is not bound to arbitrate this dispute because of the June 1994 letter from Williams to Gulf States.
Because the arbitration clauses in the Agreement between Apex and Gulf States do not cover the instant dispute over the brokerage fee, there has been no agreement to arbitrate this dispute. For this reason and the other reasons stated in this opinion, the order compelling arbitration is due to be set aside.
WRIT GRANTED.
SHORES, KENNEDY, COOK, and BUTTS, JJ., concur.
HOOPER, C.J., and MADDOX, HOUSTON, and SEE, JJ., dissent, with opinions by HOOPER, C.J., and HOUSTON, J.
HOOPER, Chief Justice (dissenting).
I join Justice Houston's dissent but add that the parties in this matter entered into a contract and should be bound by its clear wording. The majority says that Paragraph 6 of that agreement permits the Apex bankruptcy trustee to avoid being bound to arbitration. Yet, Paragraph 6 clearly states that the parties will arbitrate any conflict that arises over whether the mining operations are being conducted in accordance with the agreement.
Warco and Apex dispute the existence of the brokerage fee. It does not matter if the conflict involves coal, management, mines, or money. All of these things relate to the "mining operation," and it is obvious that the true intent of the document dictates that the parties arbitrate this conflict.
*1160 HOUSTON, Justice (dissenting).
The specific enforcement of a predispute arbitration agreement violates both Alabama statutory law and Alabama public policy, unless federal law preempts them. Lopez v. Home Buyers Warranty Corp., 670 So.2d 35 (Ala.1995). The Federal Arbitration Act preempts contrary state law and, thus, renders enforceable a predispute arbitration agreement contained in a contract that "involves" interstate commerce. Jim Burke Automotive, Inc. v. Beavers, 674 So.2d 1260 (Ala.1995), citing Allied-Bruce Terminix Companies, Inc. v. Dobson, 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995). It goes without saying that the parties will not be required to arbitrate any dispute that they did not agree to arbitrate. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995); Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University, 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989); A.G. Edwards & Sons, Inc. v. Clark, 558 So.2d 358 (Ala.1990); Ala. Code 1975, § 8-1-41(3). It appears from the materials presented that the contract at issue in the present case "involves" interstate commerce (the coal extracted by Apex was sold out of state), within the meaning of the Federal Arbitration Act. See Hurst v. Tony Moore Imports, Inc., 699 So.2d 1249 (Ala. 1997). Therefore, the dispositive issue is whether the parties agreed to submit this dispute to arbitration.
The trial court held that the dispute was arbitrable under Paragraph 23, because that paragraph refers to disputes over "the sum paid for ... services." Basically, this is an action to determine whether Warco and Gulf States (as successor to Warco) paid Apex all that it should have been paid under the contract. The gravamen of Apex's allegations is that Warco and Gulf States improperly charged it a brokerage fee and, therefore, that it was not paid the full amount due under the contract for the coal extraction services that it had provided. The 6th and 23rd paragraphs of the contract clearly contemplate the arbitration of any dispute arising out of the mining operations concerning "the sum paid for the services rendered Warco [and Gulf States] by [Apex]." To me, those paragraphs are broad enough in scope to encompass the present dispute.
Because, in my view, the arbitration clauses in the contract cover the instant dispute over the brokerage fee, I conclude that Apex and Warco had an agreement to arbitrate this dispute. Apex has failed to demonstrate to me that it has a clear legal right to the relief requested, Ex parte State ex rel. McKinney, 575 So.2d 1024 (Ala.1990); therefore, I would not direct the trial court to set aside its order compelling arbitration.
HOOPER, C.J., and MADDOX and SEE, JJ., concur.